# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **OHIOANS AGAINST CORPORATE BAILOUTS, LLC,** **aka OHIOANS AGAINST CORPORATE BAILOUTS,** *et al.,* | : Case No. **2:19-CV-4466** : : **Judge Sargus** |
| **Plaintiffs,** | : : |
| **v.** | : : |
| **FRANK LAROSE,** *in his official capacity* **as Ohio Secretary of State,** *et al.,* | : : : |
| **Defendants.** | : : : |

---

## PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Plaintiffs OHIOANS AGAINST CORPORATE BAILOUTS; DAVID J. ECKERT; BRANDON S. LYNAUGH; TREVOR J. VESSELS; JOHN DOE #1; and JOHN DOE #2 move, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, for the immediate issuance of a temporary restraining order and preliminary injunction enjoining enforcement of Ohio Revised Code § 3501.381 as said statute:

    (i)      imposes pre-registration mandates upon the proponent of a statewide candidate, or initiative or referendum issue, but not upon those actively opposing such advocacy (including circulating a contra-petition) and, thus, constitutes a content-based regulation of core political speech that does not satisfy the requirements of strict scrutiny;

    (ii)     does not provide the heightened level of clarity and precision demanded of criminal statutes implicating First Amendment rights and, thus, does not sufficiently apprise regulated parties of what is specifically required of them to avoid the draconian and criminal penalties, as well as allowing for enforcement in an arbitrary and discriminatory manner;

    (iii)    imposes undue burdens upon the fundamental rights of freedom of speech, freedom to petition the government for redress, and freedom of association without being

substantially related to important governmental interests that sufficiently outweigh the burden imposed upon First Amendment rights.

Because "if…a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and the violation of Plaintiffs' rights under the First Amendment resulting from Ohio Revised Code § 3501.381 is continuing, immediate injunctive relief from this Court is necessary.

This motion is accompanied by the following memorandum in support pursuant to Local Rule 7.2(a)(2), as well as the following evidentiary support: (i) the *Declaration of JOHN DOE #1* (Doc. No. 3); (ii) the *Declaration of Brandon Lynaugh* (Doc. No. 4); and (iii) the forthcoming *Declaration of Michael Robison*. And, as the memorandum in support exceeds 20 pages, a table of content and argument summary is included herein pursuant to Local Rule 7.2(a)(3).

Respectfully submitted,

*Of Counsel:*
David R. Langdon
Joseph A. Vanderhulst*
LANGDON LAW LLC
(513) 577-7380
david@langdonlaw.com
joseph@langdonlaw.com

* *pro hac vice application forthcoming*

 /s/ Curt C. Hartman
Curt C. Hartman
THE LAW FIRM OF CURT C. HARTMAN
7394 Ridgepoint Drive, Suite 8
Cincinnati, Ohio 45230
(513) 379-2923
hartmanlawfirm@fuse.net

Christopher P. Finney
Brian R. Shrive
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, Ohio 45245
(513) 943-6650
Chris@finneylawfirm.com
brian@finneylawfirm.com

Patrick M. Quinn
BRUNNER QUINN
35 North Fourth Street, Suite 200
Columbus, Ohio 43215
(614) 241-5550
pmq@brunnerlaw.com

*Trial Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Table of Contents ............................................................................................. i

I. Introduction ................................................................................................. 1

II. Factual Background ..................................................................................... 1

    A. Corporate welfare within H.B. 6 leads to referendum effort ..................................... 1

    B. An organized, well-funded and overly aggressive opposition exists the efforts
       to subject H.B. 6 to referendum ................................................................. 3

    C. Ohio Rev. Code § 3501.381 impacts and restricts the referendum process ............. 5

    D. Efforts to ensure strict compliance with Ohio Rev. Code § 3501.381 ..................... 7

    E. The premature pre-registration requirements of Ohio Rev. Code § 3501.381
       have caused people to not fully exercise their First Amendment rights ................. 8

    F. Lawsuit necessary to vindicate First Amendment rights ......................................... 9

III. Argument ...................................................................................................... 10

    A. The standard for issuance of temporary restraining order and preliminary
       injunction ......................................................................................................... 10

         *Primary Authorities*:
         *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453 (6th Cir.
         1997)(*en banc*)

    B. Plaintiffs are entitled to a temporary restraining order and preliminary
       injunction enjoining of Ohio Rev. Code § 3501.381 ................................................. 10

       1. Plaintiffs have a strong likelihood of success on the merits of their First
          Amendment challenge to the Ohio Rev. Code § 3501.381 ................................. 11

          a. The right of referendum and initiative involves core political speech .......... 12

            i. The right of referendum and initiative in Ohio ....................................... 12

            ii. Petition circulation in support of initiative and referendum efforts
               is core political speech protected by the First Amendment ................... 14

                *Summary of Argument*: Petition circulation involves core
                political speech for which constitutional protection is at its
                zenith.

                *Primary Authorities*:
                *Buckley v. American Constitutional Law Foundation*, 525 U.S.
                182 (1999)

b.  Ohio Rev. Code § 3501.381 regulates the content of the core political speech of only those advocating support for a prospective initiative or referendum and does not satisfy strict scrutiny .............................................. 15

*Summary of Argument*: Because the pre-registration mandates of the statutes, as well as the draconian repercussions and criminal penalties, are triggered based only upon the exercise or planned exercise of core political speech and, then, only if such speech concerns one side of an issue, the statute constitutes a content-based regulation of speech subject to strict scrutiny; the statute does not satisfy the requirements of such scrutiny.

*Primary Authorities*:

*Reed v. Gilbert*, 576 U.S. __, 135 S.Ct. 2218 (2015)

*United States v. Playboy Entm't Grp*., 529 U.S. 803 (2000)

*Republican Party of Minn. v. White*, 416 F.3d 738 (8th Cir. 2005)

*Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008)

c.  Ohio Rev. Code § 3501.381 is unconstitutionally vague .............................. 20

*Summary of Argument*: In light of broad prophylactic rules in the area of free expression being suspect (especially when criminal penalties attach), the challenged statute fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and the statute authorizes or even encourages arbitrary and discriminatory enforcement.

*Primary Authorities*:

*Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998)

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).

*Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235 (6th Cir. 2018).

Ohio Att'y Gen'l Opin. No. 2006-004

d.  Ohio Rev. Code § 3501.381 impermissibly burdens core political speech while not advancing a governmental interest .................................... 22

*Summary of Argument*:  A a confluence of sundry First Amendment interests are implicated and burdened by the statute – freedom of speech, freedom of association, and the right to exercise such freedoms anonymous and without the mandate of pre-registration – and under "exacting scrutiny", the State's interest in preventing election fraud is so attenuated, especially in light of the impact upon fundamental rights, that the statute fails constitutional muster.

*Primary Authorities*:

*Talley v. California*, 362 U.S. 60, 65 (1960)

*Watchtower Bible & Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002)

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999)

*(WIN) Washington Initiatives Now v. Rippie*, 213 F.3d 1132 (9th Cir. 2000)

2.  Irreparable injury will result and continue if Ohio Rev. Code § 3501.381 is not immediately enjoined ................................................................. 28

3.  The balance of harm tips decidedly in Plaintiffs' favor ....................................... 29

4.  The request relief will benefit the public interest ................................................ 29

IV.  Conclusion ............................................................................................................. 29

Certificate of Service ..................................................................................................... 30

**MEMORANDUM IN SUPPORT**

## I. Introduction

Plaintiffs OHIOANS AGAINST CORPORATE BAILOUTS; DAVID J. ECKERT; BRANDON S. LYNAUGH; TREVOR J. VESSELS; and JOHN DOE #1 are sponsors, managers, circulators, and signers of a referendum petition who desire to exercise their right to submit certain legislation to the voters for approval or rejection at the ballot. The exercise of this right is reserved to the people by the Ohio Constitution and any state interference with that right must comport with the United States Constitution. But the State of Ohio, by forcing, on pain of criminal prosecution, the disclosure of the identities of persons who pay others or who are paid to supervise, manage, or otherwise organize the circulation of petitions, is imposing a severe and unjustified burden upon rights under the First Amendment to freedom of speech, freedom to petition the government for redress, and freedom of association, a burden which is wholly unjustified by any legitimate interests of the state.

Plaintiffs initiated this matter by filing a Complaint challenging the constitutionality of, *inter alia,* Ohio Rev. Code § 3501.381. This provision clearly violates the First Amendment to the United States Constitution, as well as severely burdening Plaintiffs' freedom of speech, freedom to petition the government for redress, and freedom of association. As a result of the existence of this provision, Plaintiffs are suffering and will continue to suffer irreparable harm unless Defendants are immediately enjoined from enforcing it

## II. Factual Background

### A. Corporate welfare within H.B. 6 leads to referendum effort.

On July 23, 2019, the Ohio General Assembly passed, and Ohio Governor DeWine signed, Amended Substitute House Bill 6 ("H.B. 6"), legislation entitled Creates Clear Air Program.

- 1 -

Under H.B. 6, potentially over $1 billion will be given to subsidize the operations of two nuclear power plants owned by private utilities. When H.B. 6 was being considered, voices decried the corporate bailout being proposed. For example, the state director for Americans for Prosperity, Micah Derry, declared: "[I]n the plain-spoken language most Ohioans prefer to use, HB 6 is corporate welfare…. It is cronyism on full display; in other words, a bailout." And Greg Lawson of the Buckeye Institute cited H.B. 6 as "classic examples of government subsidies being used to prop up declining businesses — the Davis-Besse and Perry nuclear power plants operated by FirstEnergy Solutions."[1]

As a result of the passage into law of H.B. 6, three residents of Ohio organized and formed OHIOANS AGAINST CORPORATE BAILOUTS in an effort to subject provisions of H.B. 6 to a vote of the people of Ohio through a referendum. "The referendum … is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies. The practice is designed to 'give citizens a voice on questions of public policy.'" *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 916 N.E.2d 462, 2009-Ohio-4900 ¶18 (quoting *Eastlake v. Forest City Ents., Inc.*, 426 U.S. 668, 673 (1976) (quoting *James v. Valtierra*, 402 U.S. 137, 141 (1971))).

Through the exercise of the referendum power reserved by the people in the Ohio Constitution, *Ohio Const., Art. II, sec. 1*, OHIOANS AGAINST CORPORATE BAILOUTS is in the midst of its effort of circulating a referendum petition to subject the challenged provisions of

---

[1]     https://energynews.us/2019/05/06/midwest/conservatives-criticize-firstenergy-nuclear-bailout-bill-as-corporate-welfare/

H.B. 6 to consideration by the people.[2]  Pursuant to the requirements in Article II, Section 1c of

the Ohio Constitution, in order for H.B. 6 to be submitted to the voters for their approval or

rejection at the general election in 2020, OHIOANS AGAINST CORPORATE BAILOUTS must

submit to the Secretary of State, not later than October 22, 2019, a petition containing at least

265,774 valid signatures of registered voters in Ohio.[3]

> **B.** **An organized, well-funded and overly aggressive opposition exists to the efforts to subject H.B. 6 to referendum.**

If H.B. 6 is subject to referendum, then the $1 billion taxpayer subsidy provided by H.B. 6

to the private utility companies would be at risk.  Thus, it is not surprising that an organized and

well-funded effort to frustrate and undermine the efforts to subject H.B. to referendum has

emerged.  Misconduct in the form of harassment and intimidation by "blockers" hired by groups

supporting H.B. 6 have been widely reported in news media and on social media. Reported

incidents have included assault and property damage.[4]  The opposition groups have also created a

competing "petition" that is being presented as "official" even though there is no provision for

opposing petitions to referendum efforts and there is no further legislation being considered, such

---

[2]  Not only must the petition supporters obtain the signatures of six percent of the Ohio electorate, the Ohio constitution requires that the total amount be spread among no less than 44 of Ohio's 88 counties with no less than three percent of the electorate of each of those 44 counties. Oh. Const. art. II, § 1g.

[3]   In addition to the submission of the petition itself, proponents of an initiative or referendum petition, such as OHIOANS AGAINST CORPORATE BAILOUTS, are also required to tendered additional items other than the paper petition itself.   These additional items include: (i) an electronic copy of the petition along with a verification that the electronic copy is a true representation of the original filed paper petition; (ii) a summary of the number of part-petitions filed per county, and the number of signatures on each part-petition; and (iii) an index of the electronic copy of the petition.  *Ohio Rev. Code § 3519.16*.

[4]   *E.g.*, *Yost warns House Bill 6 supporters to not harass referendum workers*, The Columbus Dispatch, Sept. 30, 2019, *available at*  https://www.dispatch.com/news/20190930/yost-warns-house-bill-6-supporters-to-not-harass-referendum-workers?template=ampart.

that the opposing position is being falsely presented.[5]  Finally, groups opposing the referendum effort are spending millions of dollars on TV ads throughout the state in an attempt to undermine the referendum effort.[6]   Under Ohio law, those supervising, managing or otherwise organizing this well-funded and overly aggressive opposition to the petitioning effort to subject H.B. 6 to referendum have not required registration requirements or any other regulation by the State of Ohio; none of the spending or sources of spending of such an organized effort are publicly reported.

The overly aggressive (and potentially criminal) tactics of those seeking to frustrate the referendum effort of OHIOANS AGAINST CORPORATE BAILOUTS has not gone unnoticed by David Yost, the Ohio Attorney General.  In a letter dated September 30, 2019, Attorney General Yost took the extraordinary step of writing to the United States Attorneys in Ohio concerning the conduct of those opposing the referendum effort:[7]

> I have read with great concern recent media and online reports of petition circulators being targeted, harassed and intimidated by individuals opposed to the referendum effort….
> ….
> I am bringing this effort to your attention because it may ultimately overlap with your jurisdiction.  That is, federal law makes it a crime for two or more persons to conspire to injure, oppress, threaten or intimidate any person in the free exercise of any right secured by the U.S. Constitution, including the right to circulate petitions.

Notwithstanding such threat and acts of violence, OHIOANS AGAINST CORPORATE BAILOUTS has continued to persevere in its efforts, though it has given pause to some people.

---

[5]  *E.g.*, *Opponents of House Bill 6 call "dirty tricks" on fake "petition"*, The Columbus Dispatch, Sept. 23, 2019, *available at* https://www.dispatch.com/news/20190923/opponents-of-house-bill-6-call-dirty-tricks-on-fake-petition.

[6]  *Id.*

[7]  A copy of the letter is available from the website of the Ohio Attorney General at https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Letter-for-US-Attorney-in-Northern-Southern-Distri.aspx

**C.      Ohio Rev. Code § 3501.381 impacts and restricts the referendum process.**

While the Ohio Constitution provides that the requirements for the referendum process are "self-executing", it does provide that "[l]aws may be passed to facilitate their operation." *Ohio Const., art. II, sec. 1g.*  Under that purported authority, the Ohio General Assembly imposed certain statutory requirements that must be satisfied before certain persons may engage in the referendum-petitioning process. One such requirement, contained in Ohio Rev. Code § 3501.381(A)(1), imposes the following mandate:

> Any person who will receive compensation for supervising, managing, or otherwise organizing any effort to obtain signatures … for … a statewide referendum petition shall file a statement to that effect with the office of the secretary of state ….

And the next division of the same statute, Ohio Rev. Code § 3501.381(A)(2), imposes a similar mandate:

> Any person who will compensate a person for supervising, managing, or otherwise organizing any effort to obtain signatures … for … a statewide referendum petition shall file a statement to that effect with the office of the secretary of state….

As for the deadline by which such filings must be made, Ohio Rev. Code §§ 3501.381(A)(1) and 3501.381(A)(2) addresses that, too, requiring the respective statements to be filed with the Office of the Secretary of State:

> before any signatures are obtained for the petition or before the person is engaged to supervise, manage, or otherwise organize the effort to obtain signatures for the petition, whichever is later.

and:

> before any signatures are obtained for the petition or before the person engages a person to supervise, manage, or otherwise organize the effort to obtain signatures for the petition, whichever is later.

Thus, if one either receives compensation or provides compensation to any person "for supervising, managing, or otherwise organizing" "any effort" to obtain signatures for a statewide

- 5 -

referendum petition, then the requisite form must be filed with the Secretary of State before any signatures are obtained on the petition.  The requisite form has been designated or given the appellation of a "Form 15".

And the Ohio Supreme Court has imposed the requirement of "strict compliance" with the statute, rejecting substantial compliance as the appropriate standard.  *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Comm.*, 154 Ohio St.3d 86, 111 N.E.3d 1139, 2018-Ohio-3220 ¶¶8, 24 ("[s]ubstantial compliance is only acceptable when an election provision expressly states that it is….  That rule applies with particular force in this election case, in which 'strict compliance' with the law is required").  But upon the failure of but a single person to comply strictly with the mandates of Ohio Rev. Code § 3501.381, severe and draconian penalties result.

Firstly, the person who receives compensation or who provides compensation but failed to file the Form 15 faces the risk of criminal prosecution:

> Whoever violates division (A) of this section is guilty of a misdemeanor of the first degree

And, as held by the Ohio Supreme Court, the failure to file but a single or properly-completed Form 15 also results in the complete invalidation of the entire statewide petition effort:

> [if division (A) of this section is violated], the petition for which a person was compensated for supervising, managing, or otherwise organizing the effort to obtain signatures shall be deemed invalid.

*Ohio Rev. Code § 3501.381(C)*; *see Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Comm.*, 154 Ohio St.3d 86, 111 N.E.3d 1139, 2018-Ohio-3220 ¶24 ("R.C. 3501.381(C) plainly requires the invalidation of the singular 'petition' – a clear reference to the entire petition rather than to separate part-petitions").

**D.      Efforts to ensure strict compliance with Ohio Rev. Code § 3501.381**

In light of the high standards required for compliance with Ohio Rev. Code § 3501.381, as well as in light of the criminal penalties that attach for any violation, OHIOANS AGAINST CORPORATE BAILOUTS and the firm with which it has contracted to aid the signature-gather effort have exercised great caution to ensure compliance with the strict mandates of Ohio Rev. Code § 3501.381.  While it would much prefer to be focused upon its core purpose and effort of advocating in support of the referendum of H.B. 6, OHIOANS AGAINST CORPORATE BAILOUTS has had to divert time, energy, and resources to meticulously ensure absolute compliance with the pre-registration mandates of Ohio Rev. Code § 3501.381, lest any of its supporters be subjected to the potential of criminal prosecution or the entire referendum-petition effort invalidated.

The firm contracted by OHIOANS AGAINST CORPORATE BAILOUTS to aid it in the signature-gather effort, Advanced Micro Targeting, Inc., has had to divert hundreds of hours simply to ensure strict compliance with the pre-registration mandate of  Ohio Rev. Code § 3501.381 and the submission of Form 15s.  Advanced Micro Targeting began filing Form 15s on July 26, 2019, which was before the proposed petition was even filed with the Attorney General or Secretary of State.  To date, OHIOANS AGAINST CORPORATE BAILOUTS has coordinated the preparation, signing, processing and filing of approximately 1,175 Form 15s from its managers, supervisors, and circulators. These Form 15s have been meticulously collected and checked, before being hand-delivered to the Secretary of State.  All of this time, effort and resources was not spent on signature gathering, which is already subject to a compressed schedule because the petition supporters were not given the full 90-days for petition-circulating guaranteed by the Ohio Constitution.

**E.    The premature disclosure requirements of Ohio Rev. Code § 3501.381 have caused people to not fully exercise their First Amendment rights.**

The inevitable time delay between Advanced Micro Targeting receiving the Form 15s and the completed Form 15s being filed them with the Secretary of State precludes, at least for a certain period of time, the ability for it and their circulators to engage fully in core political speech with voters.  And beyond that restriction on core political speech, an even more direct and permanent impact exists as a result of the mandates and draconian penalties within Ohio Rev. Code § 3501.381 – certain individuals have foregone their desire to support the referendum effort lest their name, address, e-mail and phone number be disclosed before the submission of the referendum petition.

Having been involved in and organized others in other petition efforts, JOHN DOE #1 desires to become involved in the current effort of OHIOANS AGAINST CORPORATE BAILOUTS, both as a circulator and in overseeing a core group of individuals whom he has utilized previously in initiative-or-referendum-petition efforts.  In such a capacity, JOHN DOE #1 will likely fall within the ambit of the mandates of Ohio Rev. Code § 3501.381 and would need to file a Form 15.  And even if he somehow should be outside the mandates of the statute, due to the draconian and absolute penalties of Ohio Rev. Code § 3501.381(C), he would still file the Form 15 lest he face the unknown prospect of criminal liability or the entire petition effort of OHIOANS AGAINST CORPORATE BAILOUTS becomes invalidated.  And, finally, based on the prevalent harassment and violence that the petition circulators have encountered, JOHN DOE #1 will not participate as a manager of a petition circulation team as he is required to file a Form 15 with the Secretary of State where such information will readily be available as a public record.  Absent injunctive relief, JOHN DOE #1 will not become a paid petition circulation manager and will forgo his constitutional rights.  Succinctly stated, in order to avoid the premature public disclosure of his

support and advocacy of the referendum petition effort, JOHN DOE #1 has elected to not circulate or otherwise participate in the paid referendum-petition effort of OHIOANS AGAINST CORPORATE BAILOUTS.

### F. Lawsuit necessary to vindicate First Amendment rights.

OHIOANS AGAINST CORPORATE BAILOUTS and those circulating (or desiring to circulate) the petition to subject H.B. 6 to referendum must comply with the pre-registration mandates of Ohio Rev. Code § 3501.381 before they may engage in the full and robust effort of advocating in support of their position, lest they be subject to draconian and criminal penalties. And in order to ensure strict compliance with the broad, though indefinite, language of Ohio Rev. Code § 3501.381, OHIOANS AGAINST CORPORATE BAILOUTS and its contracted signature-gathering firm have diverted time, energy, and resources away from their core mission and purpose, *i.e.*, engaging and advocating to voters in Ohio to support the petition to subject H.B. 6 to referendum.  In contrast, those engaged in the organized, well-funded and overly aggressive opposition to such efforts are proceeding with their advocacy free of any limitation, restriction, or burden upon their core political speech.

Thus, because, *inter alia*: (i) Ohio Rev. Code § 3501.381 constitutes a content-based regulation of core political speech that does not satisfy the requirements of strict scrutiny; (ii) does not provide the heightened level of clarity and precision demanded of criminal statutes implicating First Amendment rights; and (iii) unduly burdens the fundamental rights of freedom of speech, freedom to petition the government for redress, and freedom of association without being substantially related to important governmental interests that sufficiently outweigh the burden imposed upon First Amendment rights, OHIOANS AGAINST CORPORATE BAILOUTS, together with its members, supporters, and prospective circulators, commenced the present action

challenging the constitutionality of Ohio Rev. Code § 3501.381 under the First and Fourteenth Amendments to the United States Constitution. As the constitutional violations and injury resulting therefrom are continuing and on-going, immediate injunction is relief is now needed from this Court.

## II.  Argument

### A.  The standard for issuance of temporary restraining order and preliminary injunction.

When considering whether a temporary restraining order or preliminary injunction is proper, this Court is to consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if a temporary injunction is not granted; (3) whether issuance of a TRO or preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a TRO or preliminary injunction. *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997)(*en banc*). These factors are to be balanced against one another and should not be considered prerequisites to the issuance of a TRO or preliminary injunction. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth*., 163 F.3d 341, 347 (6th Cir. 1998).

### B.  Plaintiffs are entitled to a temporary restraining order and preliminary injunction enjoining of Ohio Rev. Code § 3501.381.

In 2004, "[a] special session of the General Assembly enacted Am. Sub. H.B. 1 for the purpose of reforming Ohio's campaign finance laws, and addressing a number of ancillary aspects of the conduct of elections." *Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-37.* One of the enactments resulting therefrom was Ohio Rev. Code § 3501.381. Another provision enacted as part of that same legislation prohibited the compensation of persons who collect signatures on

election-related petitions on a per-signature basis. *Ohio Rev. Code § 3599.111.* These two provisions were opposite sides of the same coin. In fact, the Ohio Attorney General acknowledged that "R.C. 3501.381 works hand-in-hand with R.C. 3599.111." *Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-38.*

However, in 2006, Ohio Rev. Code § 3599.111 was found to be unconstitutional, in violation of the First Amendment and, thus, its enforcement enjoined. *Citizens for Tax Reform v. Deters*, 462 F.Supp.2d 827 (S.D. Ohio 2006), *affirmed,* 518 F.3d 375 (6th Cir. 2008). That other side of that same coin, *i.e.*, Ohio Rev. Code § 3501.381, also suffers from similar First Amendment infirmities. Accordingly, this Court should now finish what was started with *Citizens for Tax Reform* – the invalidation of efforts by the State of Ohio to burden and infringe upon the full and robust exercise of First Amendment rights through the imposition of pre-registration mandates before a statewide petition may be circulated for pay, lest a person face criminal and other draconian penalties.

### 1. Plaintiffs have a strong likelihood of success on the merits of their First Amendment challenge to the Ohio Rev. Code § 3501.381.

Based upon three separate and independent bases, Plaintiffs have a strong likelihood of success on the merits in their constitutional challenge to Ohio Rev. Code § 3501.381. As developed further below, immediate injunctive relief should issue because:

(i)     Ohio Revised Code § 3501.381 imposes a pre-registration mandate upon the proponent of a statewide candidate, or initiative or referendum issue, but not upon those actively opposing such advocacy (including circulating a contra-petition) and, thus, constitutes a content-based regulation of core political speech that does not satisfy the requirements of strict scrutiny;

(ii)    Ohio Revised Code § 3501.381 does not provide the heightened level of clarity and precision demanded of criminal statutes implicating First Amendment rights and, thus, does not sufficiently apprise regulated parties of what is specifically required of them to avoid draconian and criminal penalties, as well as allowing for enforcement in an arbitrary and discriminatory manner; and

(iii)    Ohio Revised Code § 3501.381 imposes undue burdens upon the fundamental rights of freedom of speech, freedom to petition the government for redress and freedom of association without being substantially related to important governmental interests that sufficiently outweigh the burdens imposed upon First Amendment rights.

Before addressing each of these constitutional infirmities infecting Ohio Rev. Code § 3501.381, appreciation should be given to the right of referendum and the various First Amendment rights and interests implicated.

### a. The right of referendum and initiative involves core political speech.

### i. The right of referendum and initiative in Ohio.

The right of referendum is one of the most basic rights of Ohioans. Indeed, the framers of the Ohio Constitution found it appropriate to note, in the very first sentence devoted to the legislative branch of government, that:

> The legislative power of the state shall be vested in a general assembly … but the people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided.

*Ohio Const., Art. II, sec. 1.* In recognition of the supremacy of the rights of initiative and referendum, the Ohio Supreme Court has held that, as a reserved power, those rights "comprehen[d] all of the sovereign power of legislation not thus delegated [and are]…not to be restricted by any limitations, except such as are imbedded [sic] in the federal constitution." *Pfeifer v. Graves*, 88 Ohio St. 472, 486, 104 N.E.2d 529 (1913); *see also Shryock v. Zanesville*, 92 Ohio St. 375, 385, 110 N.E. 937 (1915)("[t]he general assembly cannot enlarge the power of the people nor can it diminish it"). "This reserved power of referendum applies to every law passed in this state and provides an important check on actions taken by the government." *State ex rel. Ohio Gen. Assembly v. Brunner*, 115 Ohio St.3d 103, 873 N.E.2d 1232, 2007-Ohio-4460 ¶9.

Sections 1a, 1b, 1c, and 1g of Article II set forth, in considerable detail, the process for initiative and referendum – the exercise of those powers reserved to the people at the beginning of Article II.  To subject a law to referendum:

> the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly….  When [such] a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, … the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election in any year occurring subsequent to one hundred twenty-five days after the filing of such petition, and no such law, section or item shall go into effect until and unless approved by a majority of those voting upon the same.

*Ohio Const., Art. II, § 1c.*[8]

Appreciating the tendency of concentrated power to desire further concentration but wishing to protect the reserved power of the people, the constitutional framers also provided that:

> The foregoing provisions of this section shall be self-executing, except as herein otherwise provided.  Laws may be passed to facilitate [the initiative and referendum processes] operation, but in no way limiting or restricting either such provisions or the powers herein reserved.

*Ohio Const., Art. II, § 1g*.  In *Shyrock*, the Court noted:

> In this connection it will not escape notice that as to the state-wide exercise of the power the constitution goes into the minutest detail, leaving nothing to the action of the general assembly and concluding with the general statement that the provisions of the whole section should be self-executing, thereby putting it beyond the power of an unfriendly legislature to cripple or destroy it.

---

[8]   In addition to the requirement that a referendum petition contain valid signatures of six percent of the electors statewide, such a petition must also contain the signatures of at least three percent of the electors from each of at least 44 of the 88 counties of the State of Ohio.  *See* Ohio Const., Art. II, § 1g.

*Id.*, 92 Ohio St. at 382; *see also Hockett v. State Liquor Licensing Board*, 91 Ohio St. 176, 182, 110 N.E. 485 (1915)("[t]he astonishing thing about [the initiative and referendum] provisions is not their brevity but the minutia and detail with which the constitution-makers provided for safeguarding the initiative and referendum [powers]").

Thus, in construing the constitutional provision reserving to the people the initiative power, "it is the solemn duty of all courts to keep hands off and to avoid giving to the provisions of the constitution on that subject [*i.e.*, initiative and referendum] a strained construction which, by reason of its very burdensomeness and unreasonableness, would tend to depopularize it.  Such character of construction is as unwarranted as judicial construction tending to weaken or emasculate the theory [of initiative and referendum]."  *Shryock*, 92 Ohio St. at 386.

> ## ii. Petition circulation in support of initiative and referendum efforts is core political speech protected by the First Amendment.

The Supreme Court has held that petition circulation is "core political speech" involving "interactive communication concerning political change." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 186 (1999) ("*ACLF*")(quoting *Meyer v. Grant,* 486 U.S. 414, 422 (1988)). And for such interaction, the Court has declared unequivocally that First Amendment protection is "at its zenith." *Id.* at 187 (quoting *Meyer*, 486 U.S. at 425).  In addition to protecting "political expression," the First Amendment protects "political association as well." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). And "group association is [also] protected [under the First Amendment] because it enhances '(e)ffective [sic] advocacy.'" *Id*. at 65 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)).  "Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [participating in

voter registration] impair their ability effectively to organize and make their voices heard."
*Hernandez v. Woodard*, 714 F.Supp. 963, 973 (N.D. Ill. 1989).

> **b.  Ohio Rev. Code § 3501.381 regulates the content of the core political speech of only those advocating support for a prospective initiative or referendum and does not satisfy strict scrutiny.**

In 2015, "*Reed v. Town of Gilbert* … worked a sea change in First Amendment law." *Blitch v. City of Slidell*, 260 F.Supp.3d 656, 666 (E.D. La. 2017).  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Gilbert*, 576 U.S. __, 135 S.Ct. 2218, 2227 (2015).  A law can do so by either "defining regulated speech by particular subject matter" or "defining regulated speech by its function or purpose." *Id.*  While the former is a more obvious type of regulation of the content of speech, the Supreme Court has aptly descried the latter as a "more subtle" form of the content of speech.  *Id.*

Ohio Rev. Code § 3501.381 is not content-neutral on its face. The mandates of Ohio Rev. Code § 3501.381, as well as the associated draconian repercussions and criminal penalties, are triggered based only upon the exercise or planned exercise of core political speech and, then, only if such speech concerns one side of an issue.  When the speech at issue relates to *the promotion or advocacy in support of* a prospective candidate for statewide office or in support of a prospective initiative or referendum, then pre-registration mandates of Ohio Rev. Code § 3501.381 are triggered.[9]  But left untouched by Ohio Rev. Code § 3501.381 or elsewhere in state law is any

---

[9]    It is noteworthy that Ohio Rev. Code § 3501.381 regulates core-political-speech activities on matters that are not not on any ballot and may never appear on any ballot.  Instead, its regulation only concerns *prospective* candidates or *prospective* issues, though such candidates or issues may ultimately never appear on a ballot.

comparable pre-registration mandate for those paying or receiving pay to engage in core-political-speech activities in opposition to, *inter alia*, the same prospective initiative or referendum.

In the context of the present case, the organized effort to disseminate information in opposition to the current referendum petition effort of OHIOANS AGAINST CORPORATE BAILOUTS are freely occurring without any pre-registration mandate comparable to that imposed by Ohio Rev. Code § 3501. Stated otherwise, whether Ohio Rev. Code § 3501.381 applies vis-à-vis a particular political issue – in this case, whether H.B. 6 should be subject to referendum – depends upon the viewpoint of the core political speech. Advocates for the referendum must pre-register; opponents of the referendum have no such obligation.

Thus, Ohio Rev. Code § 3501.381 "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at __, 135 S.Ct. at 2227. And, consistent with *Reed*, that makes Ohio Rev. Code § 3501.381 a content-based regulation of speech and, therefore, subject to strict scrutiny. *See United States v. Playboy Entm't Grp*., 529 U.S. 803, 822-23 (2000)("[t]he distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans").

Under strict scrutiny, the State is required "to demonstrate" that the content-based regulation "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed*, 576 U.S. at __, 135 S.Ct. at 2231. Because the strict scrutiny test is an exacting inquiry, "it is the rare case in which ... a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992). And while "the term 'compelling interest' is not readily defined", "[i]t has been described as an 'interest of the highest order,' 'overriding state interest,' and 'unusually important state

interest.'" *American Broadcasting Co., Inc. v. Blackwell*, 479 F.Supp.2d 719, 739-40 (S.D. Ohio 2006).

Additionally, for a law to be "narrowly tailored", it must actually advance the compelling interest it is designed to serve, and it must be the least-restrictive method of serving that interest- indeed. As explained by the Eighth Circuit:

> As with the compelling interest determination, whether a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest. A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

*Republican Party of Minn. v. White,* 416 F.3d 738, 751 (8th Cir. 2005)(internal citations omitted); *see United States v. Alvarez*, 567 U.S. 709, 725 (2012)("to recite the Government's compelling interests is not to end the matter. The First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest. There must be a direct causal link between the restriction imposed and the injury to be prevented"); *see also California Democratic Party v. Jones*, 530 U.S. 567, 584 (2000)(the compelling-interest determination "is not to be made in the abstract, by asking whether [such interest] are highly significant values", but, instead, by considering "whether the *aspect* of [such interests] addressed by the law at issue is highly significant").

"While eliminating election fraud is certainly a compelling state interest," *Citizens for Tax Reform,* 518 F.3d at 387, there is no basis that such interests are even addressed or advanced by the pre-registration mandate of Ohio Rev. Code § 3501.381 and especially as the mandate is imposed only upon those paying or receiving pay for "supervising, managing, or otherwise organizing any effort to obtain signatures" on a statewide petition. "To survive strict scrutiny, …

- 17 -

a State must do more than assert a compelling state interest – it must demonstrate that its law is necessary to serve the asserted interest." *Burson*, 504 U.S. at 199.  Stated otherwise, "[t]he State must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)(quoting *Playboy Entm't Grp.*, 529 U.S. at 822-23).  But even assuming *arguendo* that mandating circulators and managers pre-register in order to ferret out fraud is effective, the statute does not even serve that interest because the "State requires that proponents identify only the names of *paid* circulators, not *all* circulators." *ACLF*, 525 U.S. at 212 (Thomas, J., concurring); *see also Citizens for Tax Reform,* 518 F.3d at 387 ("[t]hat is not to say, of course, that someone faced with the incentive to pad signatures will actually act upon it.  That is an empirical question, one for which there is little in the record to answer. … The State's correlation evidence…is a far cry from showing that the provision is narrowly tailored (or even reasonably tailored) to the State's legitimate interest in reducing election fraud. As explained in *Meyer*, courts should not be 'prepared to assume that a professional circulator-whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely'").  But as Ohio Rev. Code § 3501.381 is subjected to strict scrutiny, the State of Ohio cannot meet its burden.

Furthermore, Ohio Rev. Code § 3501.381 is replete with *non sequiturs*.  When consideration is given to what prompted the legislation in 2004, none the instances related or concerned individuals supervising paid petition circulators.  *See Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-37* ("[d]uring the 2004 election season, certain alleged irregularities in the circulation of candidate and issue petitions were reported by the media, some of which provided the basis for litigation challenging the placement of a particular candidate or an issue on the ballot").  But

"actual problem" is not being solved by Ohio Rev. Code § 3501.381; instead, it is a solution in search of a non-existent problem.

Additionally, the focus of Ohio Rev. Code § 3501.381 is removed from where fraud is more likely to occur, *i.e.*, with the individual circulators obtaining signatures. Nonetheless, there is no indication or evidence tying the payment of supervisors to widespread election fraud in the signature-gathering process. *See Citizens for Tax Reform,* 518 F.3d at 387 ("there is no evidence in the record that most, many, or even more than a *de minimis* number of circulators who were paid by signature engaged in fraud in the past"). Finally, the imposition of the pre-registration mandates only upon those advocating and advancing support of a petition effort, while allowing an organized, well-funded and overly aggressive opposition to engage in election fraud without any governmental pre-registration mandate clearly leaves significant influences bearing on potential election fraud unregulated.

 "Moreover, Ohio already has criminalized election fraud, specifically with regard to false signatures. See O.R.C. § 3599.28 (making false signatures on election-related documents a felony of the fifth degree). This and other criminal provisions of Ohio election law are the types of protections that the Supreme Court has found 'adequate' to deter improper conduct with regard to petition circulation, 'especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting.'" *Citizens for Tax Reform,* 518 F.3d at 388 (quoting *Meyer*, 486 U.S. at 427).

Clearly, the State of Ohio cannot and will not be able to meet its burden of establishing that Ohio Rev. Code § 3501.381 meets and satisfies the requirements of strict scrutiny. Accordingly, Plaintiffs have a substantial likelihood of success on the merits.

### c.  Ohio Rev. Code § 3501.381 is unconstitutionally vague

"The Supreme Court has cautioned that 'broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'"  *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998)(quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).  As Ohio Rev. Code § 3501.381 directly seeks to regulates activity related to and triggered by core political speech, it is subject to constitutional challenge under the void-for-vagueness doctrine.

"[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: Regulated parties should know what is required of them so they can act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.  When speech is involved, rigorous adherence to these requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).  Additionally, "[v]agueness concerns are more acute when a law implicates First Amendment rights and a heightened level of clarity and precision is demanded of criminal statutes because their consequences are more severe." *United States v. Williams*, 444 F.3d 1286, 1306 (11th Cir. 2006); *see Buckley v. Valeo*, 424 U.S. 1, 76-77 (1976)("[i]n its effort to be all-inclusive, ... the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring those sanctions may deter those who seek to exercise protected First Amendment rights").

Some degree of ambiguity is unavoidable in statutory drafting, and even a well-drafted statute may be "susceptible to clever hypotheticals testing its reach."  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 251 (6th Cir. 2018).  However,

basic principles of due process set an outer limit for how vague a statutory command can be if a person is going to be expected to comply with that command: a statute is unconstitutionally vague under the Fourteenth Amendment if its terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Id.* at 246 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

The specific conduct within and without the ambit of Ohio Rev. Code § 3501.381, a criminal statute, is not precisely clear. Through expansive, though indefinite, language, Ohio Rev. Code § 3501.381 applies not only to a person supervising or managing a specific signature gathering effort, but to "any effort" by which petition signatures are obtained. By the inclusion of the phrases "otherwise organizing" and tying it to "any effort to obtain signatures", the General Assembly clearly intended to be exceedingly expansive in the scope of the statute's application. But exactly how far and how limited is not readily apparent. In fact, in tendering an opinion on the statute to the Secretary of State, the Ohio Attorney General specially noted "uncertainty regarding the scope of R.C. 3501.381". *Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-39.* If the Secretary of State, as the chief elections officer of the State had uncertainty concerning the scope of Ohio Rev. Code § 3501.381, then the average person to whom the statute might apply cannot have the certainty to avoid running afoul of its provisions and face the prospect of criminal liability.

Furthermore, *Ohio Att'y Gen'l Opin. No. 2006-004* raises more questions than it answers with respect to the scope of Ohio Rev. Code § 3501.381. In concluding that "paid campaign staff of a candidate for statewide office are not persons who 'receive compensation for supervising, managing, or otherwise organizing any effort to obtain signatures for a declaration of candidacy'", the Ohio Attorney General arrived at this conclusion based upon his conclusion that "campaign

staffers are *not retained principally or even incidentally* to serve as petition signature gatherers." *Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-40* (emphasis added). But there is no basis in the statutory language for limiting it application to those "principally or even incidentally" involved in an organization's signature-gathering efforts. Yet, now, the Ohio Attorney General has introduced even more indefinite and vague concepts – "*retained principally or even incidentally*" to the scope of Ohio Rev. Code § 3501.381. Thus, it is not surprising that the Ohio Attorney General ultimately concluded that "the requirements of R.C. 3501.381 involves questions of fact that must be resolved on a case-by-case basis by the Secretary of State." *Ohio Att'y Gen'l Opin. No. 2006-004, at p. 2-42.* Without any clear and definitive guidance on the scope of Ohio Rev. Code § 3501.381, prospective supervisors of petition-circulating efforts, as well as the Secretary of State in enforcing its provisions, must guess and await the case-by-case resolution of the scope of its application. That is the quintessential problem with vague criminal statutes such as Ohio Rev. Code § 3501.381 – one must "navigate the Scylla of vagueness and all its chilling effects and the Charybdis of impossibly intricate regulation, which even the cognoscenti may be unable to divine." *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 307 (4th Cir. 2008)

### d. Ohio Rev. Code § 3501.381 impermissibly burdens core political speech while not advancing a governmental interest.

As developed above, activities related to the circulation of initiative petitions directly implicate and involve First Amendment issues, including freedom of speech, freedom to petition the government for redress, and freedom of association. Furthermore, "[t]he right to speak anonymously is deeply rooted in American political tradition and in First Amendment doctrine." *Novak v. City of Parma*, __ F.3d __, __ (6th Cir. July 29, 2019). Thus, not only does Ohio Rev. Code § 3501.381 implicate constitutional rights involving the freedom of speech, freedom to

petition the government for redress, and freedom of association, but also the ability to exercise

such rights anonymously or free from forced governmental disclosure.

> [T]here are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified. The reason for those holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance.

*Talley v. California*, 362 U.S. 60, 65 (1960). Yet that is precisely what the State of Ohio has done

through Ohio Rev. Code § 3501.381 – compelled the identification of persons engaged in the

exercise of core political speech and requiring such identification as a condition precedent to even

beginning to speak and advance one's cause.

"It is offensive ... to the very notion of a free society – that in the context of everyday public

discourse a citizen must first inform the government of her desire to speak to her neighbors and

then obtain a permit to do so." *Watchtower Bible & Tract Society of N.Y., Inc. v. Village of

Stratton*, 536 U.S. 150, 164-65 (2002); *see McGlone v. Bell*, 681 F.3d 718, 734 (6th Cir. 2012)

("[r]egistration requirements dissuade potential speakers by prohibiting anonymous speech").

Thus, in considering and addressing the First Amendment issues implicated by this case,

this Court should proceed with the recognition and appreciation that a confluence of sundry First

Amendment interests are implicated and effected by Ohio Rev. Code § 3501.381, *i.e.*, freedom of

speech, freedom to petition the government for redress, and freedom of association, as well as the

right to exercise such freedoms anonymous and without the mandate of pre-registration.

Singularly or collectively, the burden imposed upon the full and robust exercise of such rights by

Ohio Rev. Code § 3501.381 is not justified by any governmental interest of significant enough

magnitude to justify constitutionally burdening and violating First Amendment rights.

With the people having reserved the right of referendum and initiative in Ohio, the State

and its agents are obligated not to interfere with that right in a manner that is inconsistent with the

United States Constitution. *See Meyer*, 486 U.S. at 420. In *ACLF*, the Supreme Court held that the forced disclosure of the names and addresses of paid circulators of petitions violated the First Amendment. *ACLF*, 525 U.S. at 204. The Court found such mandatory disclosure to have an "excessively restrictive" chilling effect upon political speech protected by the First Amendment, *id*. at 187, and it was not warranted by any of the state interests allegedly justifying the disclosure. *Id*. at 192. Ohio's requirement in Ohio Rev. Code § 3501.381 – which must be complied with prior to the circulation of any part-petition less its draconian penalties are imposed – is just as burdensome, if not more burdensome, to First Amendment rights as the requirement struck down in *ACLF* and is equally unwarranted by any alleged state interests. Ohio Rev. Code § 3501.381 cannot survive constitutional scrutiny.

"[I]n the election context, although disclosure requirements may burden speech protected by the First Amendment, they are not automatically subject to strict judicial scrutiny. Rather, the Supreme Court has reviewed First Amendment challenges to disclosure requirements in the electoral context under what it has termed 'exacting scrutiny.'" *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 413 (6th Cir. 2014)(quoting *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010)). To pass "exacting scrutiny," regulations that burden political speech must be "substantially related to important governmental interests." *ACLF*, 525 U.S. at 202; *see also Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010). Thus, with respect to Ohio Rev. Code § 3501.381, consideration must be given to the burden placed on the rights at issue herein, *i.e.*, freedom of speech, freedom to petition the government for redress, and freedom of association, as well as the the ability to exercise such rights anonymously, together with the draconian penalties involved versus the governmental interest in such disclosure occurring prior to and during the petition-circulating stage of an initiative or referendum effort.

In *(WIN) Washington Initiatives Now v. Rippie*, 213 F.3d 1132 (9th Cir. 2000), the Ninth Circuit considered a similar state law that required the disclosure of the names and addresses of paid circulators. Finding such a mandate unconstitutional, the Court at the outset readily recognized that "[t]here can be no doubt that the compelled disclosure of this information chills political speech", especially anonymous political speech. *Id.*at 1137. Finding solace in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995), the Ninth Circuit recognized:

> Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse.

*WIN*, 213 F.3d at 1137-38 (quoting *McIntyre*, 514 U.S. at 356 (internal citation omitted)); *see also id.* at 1138 ("[d]epriving individuals of this anonymity is, therefore, 'a broad intrusion, discouraging truthful, accurate speech by those unwilling to [disclose their identities] and applying regardless of the character or strength of an individual's interest in anonymity'" (quoting *American Constitutional Law Foundation v. Meyer*, 120 F.3d 1092, 1103 (10th Cir. 1997)).

The Court in *WIN* then succinctly stated the "exacting scrutiny" standard applied to a mandate such as Ohio Rev. Code § 3501.381:

> [the State] must show that its interests in combating fraud and providing electoral information are substantial, that those interests are furthered by the disclosure requirement, and that those interests outweigh the First Amendment burden the disclosure requirement imposes on political speech.

*Id.* at 1138-39. In so doing, the Ninth Circuit concluded

> The State's interest in combating fraud weighs minimally in the balance. As the Supreme Court explained in *Buckley*, "ballot initiatives do not involve the risk of 'quid pro quo' corruption present when money is paid to, or for, candidates." Moreover, "[t]he risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting."

*Id.* at 1139 (quoting *ACLF*, 525 U.S. at 203 (1999)(quoting *Meyer*, 486 U.S. at 427-28).   And the Court continued:

> Even if [the State's] interest in fraud detection were substantial, the required disclosure of names and addresses of paid circulators does not further that interest. Disclosure of a circulator's name and address will not establish whether signatures on a petition he submits are forged…. In any event, the Supreme Court has expressly rejected the notion that "occasional fraud … involving paid circulators" justifies targeting paid petitioners for special enforcement. As the Court reasoned, volunteer petition circulators, who are not subject to the disclosure requirement, may be just as likely as paid petition circulators to commit fraud.

*Id.* at 1139 (quoting *ACLF*, 525 U.S. at 204 n.23 (internal quotation marks omitted).

Similarly, the pre-registration mandate of Ohio Rev. Code § 3501.381, together with its draconian penalty of invalidating the petition effort for but a single violation and the associated criminal penalties, cannot satisfy the requirements of exacting scrutiny. Firstly, the mandate severely hampers the full and robust engagement in the core political speech of the advocates of a statewide petition effort, as well as those desiring to support such efforts anonymously. A review of the evidence demonstrates that ensuring strict compliance with the pre-registration mandates of Ohio Rev. Code § 3501.381 has made proposing and qualifying initiatives or referendum more expensive. *See Citizens for Tax Reform,* 518 F.3d at 383 ("[a] review of the record evidence shows that Ohio's per-time-only requirement would make proposing and qualifying initiatives more expensive, primarily because of the inefficiencies inherent in a per-time-only system…. There is little dispute that operating under a per-time-only system will increase the costs of both proposing an initiative and qualifying it for the ballot"). The significant diversion of time, energy, and resources away from engaging in core political hours has already been address and is similarly relevant here.

Additionally, because the imposition of the pre-registration mandate of Ohio Rev. Code § 3501.381 applies to "any person" and, by definition, "person" includes "an individual, corporation, business trust, estate, trust, partnership, and association", *Ohio Code § 1.59*, the mandate expands the diversion of resources from speech-related activities as not only do consulting firms and signature-gathering firms have to engage in the pre-registration mandate, but so do all employees or the contractors of such firms. Such redundancy and duplication further inhibit the petition-circulating process and, with it, the full and robust exercise of the constitutional rights of freedom of speech and freedom to petition for redress.

And beyond the burden imposed upon committees advancing initiative or referendum petitions, the pre-registration mandate of Ohio Rev. Code § 3501.381 clearly burdens the constitutional rights of those individuals desiring to advance petition-circulating efforts, such as JOHN DOE #1. While Ohio Rev. Code § 3501.381 and the Form 15 does not explicitly mandate the disclosure of the name, address, e-mail and phone number for only those purely engaging in the signature solicitation itself, because of the draconian and criminal penalties attached for any violation (and the indefinitiveness of its scope and application), the practical effort of Ohio Rev. Code § 3501.381 is the disclosure of such information of all circulators.

Furthermore, the Form 15 requirement has had two significant negative effects on the Plaintiffs' petition effort, which have resulted in irrevocable harm and have severely impacted their ability to exercise their right to referendum. Firstly, the vagaries of the scope and ambit of Ohio Rev. Code § 3501.381, together with its draconian and criminal penalties, has resulted in Plaintiffs expending an inordinate amount time, energy, and resources to ensure strict compliance in the completion and filing of the Form 15s. Such an inordinate amount of time, energy, and resources is significantly out of proportion to any legitimate state interest that might be served and

advanced by the pre-registration mandate of Ohio Rev. Code § 3501.381. Additionally, the pre-registration mandate, including the requirement to file the Form 15, has directly resulted in enabling the organized, well-funded and overly aggressive opposition harass, block and threaten the petition circulation efforts, all the while being able to do so with impunity and anonymity because the *opponents* of the referendum effort are *not* required to file any disclosure reports or notices.

When the significant impact and burden imposed by Ohio Rev. Code § 3501.381 upon the full and robust exercise of First Amendment rights to freedom of speech, freedom to petition the government for redress, and freedom of association, together with the draconian and criminal penalties, are contrasted against any claimed governmental interest in preventing election fraud, the pre-registration mandates cannot withstand constitutional scrutiny. As the full and robust exercise of core political speech at its zenith and must be given sufficient breathing room to flourish, Ohio Rev. Code § 3501.381 cannot withstand exacting scrutiny.

### 2. Irreparable injury will result and continue if Ohio Rev. Code § 3501.381 is not immediately enjoined.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1973). Thus, satisfaction of the first prong of the preliminary injunction standard – demonstrating a substantial likelihood of success – also satisfies the irreparable injury standard. *Id.* ("when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated"); *see also Connection Distributing Co. v. Reno*, 14 F.3d 281, 288 (6th Cir. 1998)(finding that "when a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor").

- 28 -

### 3. The balance of harm tips decidedly in Plaintiffs' favor.

The State of Ohio will not suffer any harm if it is enjoined from enforcing against enforcement of Ohio Rev. Code § 3501.381. The unconstitutional character of the statute leaves no legitimate interest in the continued application or enforcement of its pre-registration mandates. And, as discussed above, there is no effort to tie the statute to any claimed governmental interests. In contradistinction, those who desire to participate in political discourse but not report such information to the government will suffer irreparable harm if Ohio Rev. Code § 3501.381 is not immediately enjoined.

### 4. The request relief will benefit the public interest

Finally, it is in the public interest to enjoin Ohio Rev. Code § 3501.381 in order to maximize the political speech of OHIOANS AGAINST CORPORATE BAILOUTS and those desiring, but not yet, circulating petitions on its behalf. *See G&V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights"). To be sure, the public interest favors the protection of constitutional rights. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982)("it is in the public interest not to perpetuate the unconstitutional application of a statute").

## IV. Conclusion

All four factors to consider militate in favor of the issuance of a temporary restraining order and preliminary injunction. As developed above, OHIOANS AGAINST CORPORATE BAILOUTS and the other Plaintiffs request that the Court immediately issue a temporary restraining order enjoining the Defendants, as well as those acting at their direction or at behest, from enforcing Ohio Rev. Code § 3501.381 as the statute suffers from constitutional infirmities.

And in light of the public interest of vindicating constitutional rights, no bond or security should be required.

Respectfully submitted,

*Of Counsel:*

David R. Langdon
Joseph A. Vanderhulst*
LANGDON LAW LLC
(513) 577-7380
david@langdonlaw.com
joseph@langdonlaw.com

\* *pro hac vice application forthcoming*

 /s/ Curt C. Hartman
Curt C. Hartman
THE LAW FIRM OF CURT C. HARTMAN
7394 Ridgepoint Drive, Suite 8
Cincinnati, Ohio 45230
(513) 379-2923
hartmanlawfirm@fuse.net

Christopher P. Finney
Brian R. Shrive
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, Ohio 45245
(513) 943-6650
chris@finneylawfirm.com
brian@finneylawfirm.com

Patrick M. Quinn
BRUNNER QUINN
35 North Fourth Street, Suite 200
Columbus, Ohio 43215
(614) 241-5550
pmq@brunnerlaw.com

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, together with the Complaint and supporting Declarations, will be served by e-mail on the 8th day of October 2019, upon the following:

Bridget C. Coontz
Assistant Attorney General
Section Chief, Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, OH  43215-3428
bridget.coontz@ohioattorneygeneral.gov
constitution.mail@ohioattorneygeneral.gov

Zach Klein
Columbus City Attorney
77 North Front Street
Columbus, OH 43215
zmklein@columbus.gov

 /s/ Curt C. Hartman