# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIOANS AGAINST CORPORATE BAILOUTS, LLC,**
**aka OHIOANS AGAINST CORPORATE BAILOUTS,** *et al.,*

        **Plaintiffs,**

        **v.**

                             **Case No. 2:19-cv-4466**
                             **JUDGE EDMUND A. SARGUS, JR.**
                             **Magistrate Judge Kimberly A. Jolson**

**FRANK LAROSE, in his official capacity as**
**Ohio Secretary of State,** *et al.,*

        **Defendants.**

## <u>OPINION & ORDER</u>

This matter is before the Court for consideration of Plaintiffs' Motion for Preliminary Injunction (ECF No. 32), which alleges that Ohio Revised Code § 3519.01(B) contains restrictions that severely burden its First Amendment rights. The Court conducted an evidentiary hearing and oral argument on Plaintiffs' Motion for Preliminary Injunction, which is now ripe for review. For the reasons that follow, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction and **CERTIFIES** questions to the Supreme Court of Ohio, as explained in this Opinion and Order.

### I. INTRODUCTION

Plaintiffs, Ohioans Against Corporate Bailouts ("OACB"), a political action committee, and four individuals, seek a preliminary injunction requiring the Ohio Secretary of State to extend the length of time during which the committee may collect a sufficient number of signatures to invoke the referendum provision of the Ohio Constitution, Article II, Section 1c-g. These sections of the Ohio Constitution provide a legal mechanism by which legislation enacted by the Ohio General Assembly can be subject to a statewide vote. According to the Ohio Constitution, if six

percent of registered voters sign a referendum petition within ninety days after the passage of the legislation, the law may not go into effective unless at a future election a majority of electors vote in favor of the measure.

Few Ohioans are unaware of Amended Substitute House Bill 6, best described in neutral fashion as an enactment that makes major changes to the regulation of the electric power industry in Ohio. Immediately after enactment on July 23, 2019, opponents and supporters of the measure locked horns in what has become one of the most expensive and divisive campaigns in Ohio history. Plaintiffs claim, and have supported the allegations with sworn testimony, that circulators of the referendum petitions have been assaulted and harassed.[1] Plaintiffs assert that the Ohio Secretary of State has enabled such conduct by enforcing a law that requires disclosure of names and addresses of all circulators, a position disclaimed by the Secretary and subject to a restraining order issued earlier in this case.

According to Plaintiffs, the ferocity of the opposition, coupled with a restriction on circulation of petitions during a so-called "blackout period," caused an unconstitutional restraint on speech by shortening the time to gather signatures. While the Ohio Constitution provides for 90 days to circulate referendum petitions, the Ohio legislature has enacted a requirement that, prior to circulation, referendum petitions must be presented to the Attorney General, who then determines whether a required summary is "fair and truthful." Ohio Revised Code § 3519.01(B)(2). In this case, the Attorney General rejected the first summary submitted by Plaintiffs. Rather than pursuing an authorized appeal to the Ohio Supreme Court, a second

---

[1] In fairness, Plaintiffs presented both affidavit and live testimony as to claimed assaults and injury inflicted by opponents of the referendum process. The only defendants in this case are the Ohio Secretary of State and the City Attorney of Columbus. Plaintiffs have not claimed that either defendant had any role in the alleged assaults or harassment. Neither defendant has any apparent interest in litigating whether such acts did or did not occur. While the Court has no reason to discredit the testimony, it is also true that no interested party had an opportunity to contest such claims.

summary from Plaintiffs followed, which was approved by the Attorney General. Plaintiffs contend that this process unconstitutionally deprived them of 38 of the 90 days provided for in Article II, Section 1c of the Ohio Constitution.

Yet, the jurisdiction of this Court is defined not by the scope of the issues raised in this highly public, bitter debate. In Article III of the United States Constitution, as constrained by the Eleventh Amendment, for purposes of this case, the Court has jurisdiction to decide cases and controversies arising only under federal law. As the parties agree, this Court does not have jurisdiction over any claim that the Secretary of State or the Ohio General Assembly has violated the referendum provisions of the Ohio Constitution.

For the reasons that follow, this Court denies Plaintiffs' motion for a preliminary injunction. The alleged unconstitutional diminution of the time to circulate petitions does not state a colorable claim under the federal constitution. The 90-day window to circulate petitions is only prescribed in the Ohio, not federal, Constitution. As the Secretary of State notes, no Ohio court has directly addressed whether the ninety-day period is guaranteed or whether the statutorily required review by the Attorney General before circulation may begin violates the Ohio Constitution. The Secretary contends, and the Court agrees, that "unsettled issues of Ohio law permeate Plaintiffs' claims." (ECF No. 32 at 18.) Insofar as this Court lacks subject matter jurisdiction to determine such state law issues, the Court certifies a series of state law questions to the Ohio Supreme Court, as suggested by the Secretary of State.

## II. BACKGROUND

### A. Ohio's Referendum Procedure

Under the Ohio Constitution, "[t]he legislative power of the state shall be vested in a general assembly consisting of a senate and house of representatives but the people reserve to

3

themselves the power…to adopt or reject [laws and amendments to the constitution] at the polls on a referendum vote." Art. II, sect. 1. "The referendum…is a means for direct political participation, allowing the people the final decision, amounting to a veto power, over enactments of representative bodies." *Eastlake v. Forest City Ents., Inc.*, 426 U.S. 668, 673 (1976). "The practice is designed to 'give citizens a voice on questions of public policy.'" *Id.* (quoting *James v. Valtierra*, 402 U.S. 137, 141 (1971)). "This reserved power of referendum applies to every law passed in this state and provides an important check on actions taken by the government." *State ex rel. Ohio Gen. Assembly v. Brunner*, 115 Ohio St. 3d 103, 104–05 (Ohio 2007). For that reason, "[l]aws generally do not take effect until 90 days have passed from the date they are filed by the governor with the secretary of state, to allow for a possible referendum." *Id.* (citing Ohio Const., Art. II, Sect. 1(c)). "If no referendum petition is filed in this 90-day period, the law become effective immediately; if a referendum petition is filed, the law becomes effective when a majority of electors approve it or it is determined that the referendum petition lacks a sufficient number of valid signatures." *Brunner*, 115 Ohio St. 3d at 105 (citation omitted). "Thus, the 90-day period is a critical time to initiate the process of giving citizens their voice on a question of public policy." *Id.*

Because it functions as a veto, the referendum process may begin only after the Governor files a law in the office of the Secretary of State. Then, petitioners must first designate a committee of three to five individuals to represent them in all matters relating to the referendum petition. Ohio Rev. Code § 3519.02. Next, petitioners may file an initial written petition ("Initial Petition") with the Ohio Attorney General and Secretary of State. To be valid, an Initial Petition must contain at least 1,000 proper signatures and the full text and a summary of the law or section of the law to be referred. *See* Ohio Rev. Code § 3519.01(B)(1). Within one business day of filing the Initial Petition

with the Secretary of State, petitioners must also file the same full text and summary of the law with the Ohio Attorney General. *See id.*

Within ten business days of receiving the Initial Petition, the Secretary of State must verify the number of valid signatures and compare the full text of the law or section of the law on file. If the text is correct and a requisite number of signatures are deemed valid, the Secretary of State must certify the Initial Petition. Within that same allotted period, the Attorney General must determine whether the petitioners' summary is a "fair and truthful statement" of the referred law. Once an Initial Petition is certified by both the Attorney General and Secretary of State ("Approved Petition"), petitioners can then begin the next step—gathering signatures. But if any portion of the Initial Petition is rejected, petitioners must restart the Initial Petition process.[2]

Before circulating may begin, any person compensating or receiving compensation for supervising, managing, or otherwise organizing any effort to obtain signatures must file a specific form ("Form 15") with the office of the Secretary of State. The Form 15 requires those individuals to provide their name, home address, email address, and phone number.

Under Ohio law, a referendum petition that is circulated must contain the summary language approved by the Attorney General, as well as the Secretary of State's certification. Ohio Rev. Code § 3519.05. The Ohio Constitution provides that the total number of signatures on the petition must equal at least six percent of the total vote cast for the office of governor at the last gubernatorial election. The Constitution also provides that these signatures must have been obtained from at least 44 of the 88 counties in Ohio, and, from each of these 44 counties, there must be signatures equal to at least 3 percent of the total vote cast for governor in that county at the last election.

---

[2] Ohio law permits petitioners to appeal to the Ohio Supreme Court the Attorney General's initial rejection of their Initial Petition. *See* Ohio Rev. Code § 3519.01(C). Plaintiffs did not do so.

## B. Factual Background

On July 23, 2019, the Ohio General Assembly passed Amended Substitute House Bill 6 ("H.B. 6"). That same day, Governor DeWine signed H.B.6 and filed it with the Secretary of State. Plaintiff OACB is a ballot issue political action committee seeking to subject H.B.6 to referendum. To do so, OACB was required to submit 265,774 signatures to the Secretary of State by October 22, 2019.

On July 29, 2019, OACB filed an Initial Petition regarding H.B.6—including 2,866 signatures and the text and summary of H.B.6—with the Ohio Secretary of State and Attorney General. On August 12, 2019, the Ohio Attorney General rejected OACB's Initial Petition because the summary was not a "fair and truthful statement" of H.B.6. That same day, the Secretary of State notified OACB that it would not certify the submitted signatures or full text of H.B.6 without the summary approval of the Ohio Attorney General. OACB did not appeal the Ohio Attorney General's rejection of the summary.

On August 16, 2019, OACB filed a second Initial Petition to subject H.B.6 to referendum with the Secretary of State and Attorney General. On August 29, 2019, the Attorney General certified that the second Initial Petition's summary was "fair and truthful." The next day, the Secretary of State notified OACB that the second Initial Petition contained at least 1,000 valid signatures. Consequently, 38 days after H.B.6 became subject to referendum and 52 days before H.B.6 went into effect, OACB satisfied the statutory requirements necessary to obtain an Approved Petition.

At an evidentiary hearing held on October 22, 2019, OACB notified the Court that it had not filed a referendum petition with the Secretary of State because it had failed to collect the 265,774 necessary signatures. Instead, OACB had gathered 221,092 signatures.

6

OACB presented witness testimony from William Rogers, President of Advanced Micro Targeting ("AMT"), who was hired by OACB to manage the referendum's signature gathering operation. Rogers' testimony focused on two matters: the hardship AMT faced during its operations in Ohio and its ability to collect the requisite number of signatures, if AMT was granted an additional 38 days.

First, Rogers averred that Ohio's procedure for referendum caused serious hardship due to disclosure requirements and impossible timing standards. Rogers testified that he had never encountered a "more hostile environment" in any other state in which he had conducted a petition campaign during his three-decade career. According to Rogers, AMT's problems began shortly after its employees and contractors filled out Form 15s, which disclosed the names, addresses, email addresses, and phone numbers of petitioners, organizers, managers, and circulators to the public, including the referendum's opponents.[3] Rogers testified that opponents used this information to find circulators and harass, assault, or pay them to leave the petition operation and Ohio, altogether. In his view, many AMT circulators left because "blockers," people hired by the opposition, surrounded and harassed circulators. Based on the interference AMT's circulators were facing, two weeks after the petition drive began Rogers notified OACB that AMT would not be able to gather the 265,744 signatures. As a result, AMT began subcontracting with pay-per-signature firms in late September.

---

[3] Ohio Revised Code § 3501.381(A)(1) states that "[a]ny person who will receive compensation for supervising, managing, or otherwise organizing any effort to obtain signatures for...a statewide referendum petition shall file a statement to that effect with the office of the secretary of state before any signatures are obtained for the petition or before the person is engaged to supervise, manager, or otherwise organize the effort to obtain signatures for the petition, whichever is later." Plaintiffs took the position that a Form 15 was required for every paid circulator engaged to circulate referendum petitions, though Defendant LaRose contended the statute did not apply to paid circulators. On October 11, 2019, this Court issued a Temporary Restraining Order enjoining enforcement of "the otherwise organizing any effort to obtain signatures" language of the statute against paid individuals whose primary function is circulating a petition for signatures for statewide referendum. (ECF No. 26 at 7.)

Rogers averred that the blockers were not the only interference that AMT faced during its signature gathering operation. He testified that parties opposing the referendum began circulating a "fake petition"—one that had no legal significance, was not intended for submission, and therefore was not subject to validity requirements. Rogers testified that this caused confusion to the public and enabled the opposition to "raid" AMT's circulators by paying more per signature. According to Rogers, in early October, AMT's employees and contractors were receiving offers to cease circulating for AMT, which paid around $120 per day, and instead circulate the "fake petition," for pay up to $2,100 per day.[4] As a result, Rogers avers, AMT's turnover was higher than its hiring rate. To illustrate, Rogers testified that AMT had 1,100 circulators collecting signatures for the referendum petition on September 3rd. By October 21st, the company only had 200 circulators.[5] Therefore, Rogers concluded, the Secretary of State provided its competitors with a "roadmap" to disrupt AMT's operation and defeat the referendum petition.

Rogers also testified that AMT could obtain the additional necessary signatures, if given an additional 38 days. To start, Rogers explained that when AMT previously operated a petition campaign in Ohio in 2017, it collected over 4,100 signatures each day. Based on that estimate, Rogers testified that he could have obtained the 265,774 necessary signatures for the H.B.6 referendum in 75 days. And, even if not all of those signatures were validated, Rogers averred that with the 10-day "cure period," AMT could obtain the additional valid votes necessary to subject H.B.6 to referendum.

---

[4] Rogers averred that AMT circulators received offers to circulate the "fake petition" for $500 and $8 per "raw signature." He also testified that any circulator could easily obtain 200 "raw signatures" per day.

[5] Rogers testified that AMT's turnover rate during this operation (85–90%) is unprecedented. According to Rogers, AMT's typical turnover rate during a 60-day operation is about 30%.

**C. Procedural Background**

On October 7, 2019, Plaintiffs filed a three count Complaint against Defendants Secretary of State Frank LaRose and City Attorney of Columbus Zach Klein (collectively "Defendants") seeking injunctive relief enjoining Defendants from enforcing certain restrictions regarding Plaintiffs' referendum rights under the Ohio Constitution and First and Fourteenth Amendment rights under the Federal Constitution. (See generally Pls.' Compl. [ECF No. 1].) On October 8, 2019, Plaintiffs filed an Application for a Temporary Restraining Order regarding their first count, which alleges that Ohio Revised Code § 3501.381 is unconstitutional. (ECF No. 2.) On October 11, 2019, the Court held oral argument regarding Plaintiffs' Application for a Temporary Restraining Order, which, on that same day, the Court granted in part and denied in part with an Opinion and Order. (ECF No. 26.)

On October 15, 2019, Plaintiffs filed their Motion for Preliminary Injunction (See Pls.' Mot. for Prelim. Inj. [ECF No. 32]) with respect to their second count, which alleges that Ohio Revised Code § 3519.01(B) contains restrictions that severely burden their First Amendment rights as provided by the United States Constitution. Plaintiffs requested an injunction "affording the [Plaintiff OACB] an additional 38 days in which to continue its referendum-petition efforts for an additional 38 days and, should [Plaintiff OACB] not have a sufficient number of signatures to tender to the Ohio Secretary of State on October 21, 2019, they request the Court retroactively stay the effective date of H.B. 6 or otherwise provide that [Plaintiff OACB] is afforded the full 90-day period provided for in the Ohio Constitution for the circulation of referendum petitions." (ECF No. 32 at 19.)[6] On October 21, 2019, Defendants filed their Response. (ECF No. 39.) That same day,

---

[6] Because Plaintiffs did not submit the referendum petitions by the October 21, 2019 deadline, their Reply brief requests an injunction: "(i) affording the COMMITTEE an additional 38 days in which to continue engaging in core political speech with the voters of Ohio through the circulation of its referendum petition and, upon the COMMITTEE tendering a sufficient number of signatures at the conclusion of that period, directing the Secretary

the Court conducted an evidentiary hearing and oral argument on Plaintiffs' Motion for Preliminary Injunction, which is now ripe for review.

## III. STANDARD

A district court must balance four factors when considering a request for a preliminary injunction: (1) whether the claimant has demonstrated a strong likelihood of success on the merits; (2) whether the claimant will suffer irreparable injury in the absence of a stay; (3) whether granting the stay will cause substantial harm to others; and (4) whether the public interest is best served by granting the stay. *Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Cooey (Biros) v. Strickland*, 589 F.3d 210, 218 (6th Cir. 2009) (quoting *Mich Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). "'When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 412 (6th Cir. 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998)). "With regard to the factor of irreparable injury, for example, it is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id*. (internal quotations omitted).

## IV. ANALYSIS

Plaintiffs claim that the Ohio Constitution grants them 90 days to circulate referendum petitions. (Mot. for Prelim. Inj., ECF No. 32 at 1.) They further contend that the "extra-constitutional" requirements of Ohio Revised Code § 3519.01(B) "steals several days from the full

---

of State to proceed pursuant to the Ohio Constitution and state law as though such petition was tendered within the constitutionally-mandated 90-day period; and (ii) to the extent necessary, to retroactively stay the effective date of H.B. 6 until the conclusion of that 38-day period." (ECF No. 44 at 8-9.)

90-day period provided for in the Ohio Constitution" and creates "a Blackout Period during which the proponents of a referendum petition are precluded from engaging in core political speech." (*Id.* at 5.) Once this "Blackout Period" is over, Plaintiffs claim that "the remaining and narrow time left to engage in a successful referendum-petition effort is so constrained and limited that the core political speech of those advocating for a referendum, i.e., advocating for governmental change and accountability, has been and will continue to be unduly and significantly burdened." (*Id.* at 17.)

## A. Federal Claims

Plaintiffs acknowledge that there is no federal constitutional right to a referendum; Ohio law creates the right. (*Id.* at 3, 10.) But they claim, correctly, that once the right is created, a state cannot unduly restrict the First Amendment rights of its citizens who support the referendum effort. (*Id.*) They argue Ohio Revised Code § 3519.01(B) does just that:

> [T]wo distinct aspects run afoul of the First Amendment as they directly impact and unconstitutionally burden the 90-day period in which to circulate a referendum petition: (i) the Blackout Period during which no signatures may be obtained on a referendum petition operates as an absolute ban on core political speech during the constitutionally-mandated 90 days in which to circulate a referendum petition and during which the law that is the target of the referendum is not yet effective; and (ii) because of the inherent delay resulting while awaiting governmental pre-approval of a referendum-petition effort, an undue and constitutional burden is imposed upon the 90-day period which, in fact, results in a significantly more narrow period of time to advocate in favor of a referendum effort because it creates a ban on circulating until the Attorney General provides its certification and "steals" precious days from the circulation effort.

(*Id.* at 10-11.) But as Plaintiffs acknowledge, the 90-day period is a creation of the state, not the federal Constitution. Instead, Plaintiffs claim that the "blackout period" violates the First Amendment of the U.S. Constitution by operating as a ban on core political speech because it prohibits petition circulation until the required certification from the Attorney General and Secretary of State is received. (ECF No. 32 at 5.) As this Court has previously recognized, "The

Supreme Court has held that petition circulation is 'core political speech' for which First Amendment protection is 'at its zenith.'" *Citizens in Charge v. Brunner*, No. 2:10-CV-95, 2010 WL 519814, at \*2 (S.D. Ohio Feb. 10, 2010) (quoting *Buckley v. Am. Constitutional Law Found. (ACLF)*, 525 U.S. 182, 186–87 (1999)). Plaintiffs claim that "with respect to the Blackout Period and the effective ban on core political speech wrought by it as it concerns seeking signatures on a petition, the State of Ohio must satisfy the requirements of strict scrutiny." (ECF No. 32 at 12.)

Defendant LaRose argues that the certification requirement does not restrict "expressive conduct," but instead is an "election-mechanics rule" that "sets forth certain procedures for the referendum process." (ECF No. 39 at 10.) He claims that "nothing about Ohio Revised Code § 3519.01(B) forbids the referendum committee or anyone else from speaking out in favor of the petition or attempting to centralize the referendum in public discourse" and that it survives rational-basis review. (ECF No. 39 at 11.)

This Court has found no controlling precedent holding requirements similar to the those in Ohio Rev. Code § 3519.01(B) as unconstitutional under the First Amendment. The Ninth Circuit, however, has addressed a similar First Amendment challenge to Nevada statutory requirements for referendum initiatives and petitions.

In *PEST Committee v. Miller*, 626 F.3d 1097 (9th Cir. 2010), the Ninth Circuit considered a First Amendment challenge to Nevada's statutory single-subject, description-of-effect, and pre-election challenge provisions. Under the Nevada Constitution, a copy of an initiative or referendum petition must be filed before circulation can begin. *Id.* at 1100 (citing Nev. Const. art. 19, § 1). A Nevada statute required that the petition contain a single subject and a description of the effect of the initiative or referendum. *Id.* (citing Nev.Rev.Stat. 295.009). A related provision allowed pre-election challenges to the initiative or referendum as to whether it satisfies the single-subject and

description of effect requirements. *Id.* at 1101 (citing Nev.Rev.Stat. 295.061(1)). A ballot advocacy group whose ballot initiative effort was subject to a pre-election challenge claimed the statutory requirements violated the First and Fourteenth Amendments. *Id.* at 1102.

The district court held "neither the single-subject nor the description-of-effect requirement severely burden speech 'because, on their face, they are content neutral and do not restrict the overall quantum of speech'" and "upheld the constitutionality of the requirements as reasonable, non-discriminatory means of furthering the important state interest of protecting the integrity of Nevada's election process, *e.g.*, by preventing voter confusion and promoting informed decision making." *Id.* at 1103. The district also held that the pre-election challenge provision did not burden political speech: "'It is not, as Plaintiffs suggest, an underhanded attempt by the Legislature to thwart the initiative process by allowing political opponents to bring legal challenges to stall petition circulation. Rather, NRS 295.009 protects initiative proponents' speech rights by ensuring that any legal challenge based on the single-subject and description-of-effect requirements are brought—and resolved—early.'" *Id.* at 1104. The plaintiff argued that that the district court erred because "Nevada's single-subject and description-of-effect requirements, together with its pre-election challenge provision, burden core political speech or otherwise heavily burden First Amendment rights and, as such, must be subjected to strict scrutiny and narrowly tailored to serve a compelling state interest." *Id.* at 1103.

The Ninth Circuit acknowledged the Supreme Court's holding in *Meyer v. Grant*, 486 U.S. 414 (1988), that petition circulation is "core political speech" because it involved "interactive communication concerning political change." *Id.* at 1105. (internal citations omitted). The court also noted that in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999), "the Supreme Court applied heightened scrutiny to Colorado's name badge and reporting requirements

for petition circulators, concluding that the restrictions in question significantly inhibit communication with voters about proposed political change because the one-on-one communication involved in petition circulation requires circulators to endeavor to persuade electors to sign the petition." *Id.* (internal citations omitted). The Ninth Circuit cited to Justice Thomas' concurrence in *Buckley*, however, for the proposition that there is a distinction between regulations affecting core political speech and those regulating "the mechanics of the electoral process." *Id.* Under the Ninth Circuit's precedent, the burdens on core political speech or severe burdens on other rights are subject to strict scrutiny and must be narrowly tailored to serve a compelling government interest. *Id.* at 1106 (citing *Buckley*, 525 U.S. at 207). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* at 1106 (citing *Prete v. Bradbury*, 438 F.3d 949 (9th Cir.2006)).

The Ninth Circuit concluded that the district court was correct in holding that neither the single-subject nor description-of-effect requirements were direct regulation of core political speech or imposed a severe burden on the plaintiffs' First Amendment rights:

> The Nevada requirements are **prerequisites** to the circulation of initiative and referendum petitions. They do not implicate protections for core political speech because they do not directly affect or even involve one-on-one communications with voters. Instead, the district court correctly concluded that the requirements advance Nevada's important interests in avoiding confusion, promoting informed decision-making, and preventing "logrolling." The provisions represent a permissible regulation of the mechanics of the electoral process. They do not, in and of themselves, have the effect of limiting the overall quantum of speech available to the electorate.

*Id.* at 1107. (internal citations omitted) (emphasis added). Because the restrictions were content-neutral, and there was no evidence that they were applied in a discriminatory manner, the

district court did not err in applying "the more flexible balancing test to those requirements and determining that they serve important state interests." *Id.* at 1108.

The Ninth Circuit then considered the pre-election challenge provision, finding it was a "closer question" because the plaintiff had presented some evidence that pre-election challenges can tie up petitions in litigation for extended periods of time and had even "left the proponents without sufficient time to gather signatures in advance of the filing deadlines for a particular election cycle." *Id.* at 1109. The court held:

> Although it is the actual circulation process (and the attendant one-on-one communication with potential voters) that has been determined to be "core political speech," the fact that the pre-election challenges may, in some cases, prevent petitions from being placed on the ballot could be viewed as implicating core political speech concerns. However, the PEST Committee has not established that Nevada's process for preparing an initiative or referendum petition for circulation constitutes, or otherwise directly affects, the type of "interactive communication concerning political change" that is properly considered core political speech. The pre-election challenge procedure does not involve one-on-one communication with voters, and the **PEST Committee has not argued or demonstrated that initiative or referendum proponents have, or should have, a right to engage in one-on-one communication with voters about their political ideas before Nevada's single-subject and description-of-effect requirements are satisfied**.

*Id.* (emphasis added). The court held that the pre-election challenge procedure did not implicate core political speech, and that the remaining inquiry was whether the statute imposed a severe burden on speech by restricting "the overall quantum of speech available." *Id.* The court concluded that even assuming that the pre-election challenges could burden First Amendment rights by delaying or preventing the circulation of petitions in an initiative or referendum effort, there was "no basis for determining that permitting political opponents to vet petitions for compliance with the single-subject and description-of-effect requirements functions in anything other than a content-neutral and non-discriminatory manner." *Id.* at 1109. Moreover, any burden

there was not created by statute, but simply a codification of the existing common law writ process. *Id.*

While the Ninth Circuit's reasoning is not controlling on this Court, it was adopted recently by Judge James L. Graham in *Committee to Impose Term Limits v. Ohio Ballot Board*, 275 F.Supp.3d 849 (S.D. Ohio 2017) in a challenge to the single-subject requirement in the initiative procedure in Ohio Rev. Code § 3519.01(A), the initiative counterpart to the statute challenged by Plaintiffs here (Ohio Rev. Code § 3519.01(B)). In *Committee to Impose Term Limits*, the plaintiffs claimed the single-subject requirement of the initiative procedure imposed an undue burden on the exercise of their First Amendment rights. *Id.* at 854. This Court recognized that petition circulation is "core political speech" for which First Amendment protections are at their "zenith." *Id.* at 855 (quoting *Meyer*, 486 U.S. at 424 and *Buckley*, 525 U.S. at 186). But the court also recognized that "States have 'considerable leeway to protect the integrity and reliability of the initiative process as they have with respect to election processes generally.'" *Id.* at 855-856 (citing *Buckley*, 525 U.S. at 191, 119 S.Ct. 636).

This Court stated that "[t]he distinction between core political speech and the mechanics of the election process is often fleeting because even election-mechanics 'regulations often will directly restrict or otherwise burden core political speech and associational rights.'" *Id.* at 856. (quoting *Buckley*, 525 U.S. at 206, 119 S.Ct. 636 (Thomas, J., concurring in the judgment)). Sometimes, the court noted, it is clear that a statute is a pure regulation of speech. *Id.* (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)). But when it is not clear, the court looks to the burden imposed on a plaintiffs' free speech and applies the "*Anderson-Burdick*" framework developed by the Supreme Court: "[w]hen a State's rule imposes severe burdens on speech or association, it must be narrowly tailored to serve a compelling interest; lesser burdens

16

trigger less exacting review, and a State's important regulatory interests are typically enough to justify reasonable restrictions…So, if 'a ballot-access provision chills First Amendment speech, the level of scrutiny to be applied depends on the severity of the burden.'" *Id.* at 856 (internal citations omitted).

This Court framed the issue as: "how much of a burden is Ohio's separate-petitions rule?" *Id.* The court noted that "[t]he Supreme Court appears to take the position that single-subject rules for voter initiatives—like the rule at issue here—are part of regulating the electoral process and do not impose a severe burden on free speech rights." *Id.* at 856. Under *Buckley* and related cases, it was possible that initiative-petition regulations could be subject to strict scrutiny, but only in narrow circumstances when they constituted a severe burden—if they significantly inhibited communication with voters, applied a facially neutral law in a discretionary manner, or were content-based or disparately impacted a particular viewpoint. *Id.* at 857.

This Court held that there was no meaningful distinction between the plaintiffs' challenge and the challenge in *Pest Committee*:

> Here, the separate-petitions rule is not a direct regulation of core political speech, it does not significantly inhibit communication with voters, it does not disparately impact any particular viewpoint, and it is content-neutral.
>
> The separate petitions rule is a "prerequisite[ ] to the circulation of initiative and referendum petitions. [It does] not implicate protections for core political speech because [it does] not directly affect or even involve one-on-one communications with voters." *Pest Committee*, 626 F.3d at 1107. Ohio's rule does not burden the interchange of ideas; indeed, nothing prevents petition circulators from proposing both amendments to would-be signatories in the same encounter—the would-be signatory will now be presented with separate proposed constitutional amendments and can sign a petition for neither, one, or both. Just like the rules in *Pest Committee*, Ohio's separate-petitions rule doesn't constitute a direct regulation of core political speech. In fact, "[i]f anything, requiring proponents to pursue separate initiatives on separate subjects might encourage more speech on each such subject." *Campbell*, 203 F.3d at 745. And in this way, the

> separate-petitions rule does not limit the "quantity of speech available" to Plaintiffs. *Id.*

*Id.* at 858. The court held that the plaintiffs could not claim the separate-petitions rule was applied against them in a discriminatory manner, and that the rule was content-neutral under *Reed v. Town of Gilbert, Ariz.*, — U.S. — ,135 S.Ct. 2218, 2227, 192 L.Ed.2d 236 (2015). *Id.* at 858-59. The court concluded that a more "relaxed standard" applied under the *Anderson-Burdick* framework: "whether a State's important regulatory interest is enough to justify reasonable restrictions." *Id.* at 859 (citing *Buckley*, 525 U.S. at 206, 119 S.Ct. 636 (Thomas, J., concurring in the judgment) (citing *Burdick, Timmons*, and *Anderson*)). The court held that the state's interest of "[v]oting on each proposal separately avoids confusion, promotes informed decision-making, and prevents logrolling" and concluded these were "important government interests recognized by other courts." *Id.* at 859 (citing *Pest Comm.*, 626 F.3d at 1107). "Ohio's separate-petitions rule serves important state interests without impermissibly burdening free speech. Therefore, under less exacting scrutiny, the rule is constitutional." *Id.* The Sixth Circuit affirmed the district court's holding that regulation was not content-based and its application of *Anderson-Burdick. Comm. to Impose Term Limits v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018).[7]

Additionally, the Supreme Court and other federal courts have upheld requirements for obtaining a certain number of signatures within a prescribed time frame. *Duncan v. Husted*, 125 F. Supp. 3d 674, 681 (S.D. Ohio 2015), aff'd (Mar. 7, 2016); *see also Storer v. Brown,* 415 U.S. 724, 740, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (finding that, "standing alone, gathering 325,000

---

[7] Notably, the initiative procedure challenged in *Committee to Impose Term Limits* also includes a requirement that an initiative petition include a summary of the proposed law or amendment, and that the Attorney General certify within 10 days whether the summary is a fair and truthful statement of the proposed law or constitutional amendment before forwarding the petition to the Ohio Ballot Board. Ohio Rev. Code § 3519.01(A). That case did not address, however, the constitutionality of the certification requirement in that subsection.

signatures in 24 days," was "a substantial requirement," but "would not appear to be an impossible burden.").

This Court agrees with the reasoning of Judge Graham in *Committee to Impose Term Limits* and finds Plaintiffs are not likely to succeed on the merits of their claim of First Amendment infringement based upon the "blackout period" of Ohio Revised Code § 3519.01(B). Because Plaintiffs are not likely to succeed on the merits of the claim, they are not likely to suffer irreparable injury, and it would not be in the public interest, and would be cause harm to Defendants, if the Court were to enjoin enforcement of the statute. Accordingly, this Court denies Plaintiffs' motion for a preliminary injunction.

**B. State Law Issues**

Defendant LaRose argues that "Plaintiffs' request for preliminary injunction begins and ends with unsettled questions of Ohio law. Those questions must be certified to the Supreme Court of Ohio." (ECF No. 39 at 17). Pursuant to Rule 9.01 of the Rules of Practice of the Ohio Supreme Court, a federal court may certify questions of law to the Ohio Supreme Court when "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court."

Defendant LaRose contends that there is "fundamental problem" with Plaintiffs' motion—that, "in Plaintiffs' own words they are seeking relief under Ohio law. They are asking for the exact amount of time that they claim the Ohio Constitution grants them—38 more days—that they claim an Ohio statute, Ohio Rev. Code § 3519.01, takes away." (ECF No. 39 at 16.) Defendant LaRose argues that Plaintiffs essentially claim an Ohio statute violates a right granted by the Ohio Constitution. But, he says, "no Ohio Court has decided that issue, and this Court does not have jurisdiction to consider it." (ECF No. 39 at 16.)

19

A claim that a state official violates state law in carrying out his or her official duties is a claim against the State, which is barred by the Eleventh Amendment, depriving a federal court of jurisdiction to hear the matter. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). Accordingly, a claimant under 42 U.S.C. § 1983, under which this suit is brought, may not obtain injunctive relief against state officials based on alleged violations of state law. *Doe v. Ohio*, No. 2:91-cv-464, 2012 WL 12985973 at *12, n.13 (S.D. Ohio Feb. 16, 2012).

This Court therefore does not consider whether Ohio Rev. Code § 3519.01(B) violates the Ohio Constitution—this Court only has jurisdiction over a claim that Ohio Rev. Code § 3519.01(B) violates the federal Constitution. But Defendant LaRose claims that "guidance from the Ohio Supreme Court on precisely how (and whether) Ohio's fair-and-truthful review impacts the 90-day referendum period is dispositive of [Plaintiffs'] First Amendment claims. If Plaintiffs wanted a definitive resolution of these issues, they could have—and should have—asked the Ohio state courts to determine whether § 3519.01(B) violates the Ohio Constitution. Instead, Plaintiffs ask this Court to wade into the minutiae of state referendum procedures." (*Id.* at 17.)

Defendant LaRose states that "[u]nsettled issues of Ohio law permeate Plaintiffs' claims and the outcome of their constitutional challenge turns on the proper interpretation of Ohio law" and contends that "[n]o Ohio Court has considered" the following questions:

1.) Whether the right to referendum set forth in Article II, Section 1 of the Ohio Constitution guarantees those circulating petitions in support of a referendum a full ninety days solely for the purpose of circulating petitions?

2.) If so, whether Ohio Rev. Code § 3519.01 violates the Ohio Constitution by shortening the ninety days to accommodate the fair-and-truthful review?

3.) If the Ohio Constitution guarantees a petitioner ninety days to circulate petitions, whether the number of days attributable to a petitioner's own errors in submitting a referendum petition under Ohio Rev. Code § 3519.01 is "credited" to the petitioner, or deducted from the ninety days?

20

4.) Whether a petitioner who does not claim to be "aggrieved" by the fair-and-truthful determination and thus fails to appeal the denial of a certification under Ohio Rev. Code § 3519.01(C) is entitled to credit toward the ninety days for the time spent fixing deficiencies in a fair-and-truthful statement?

5.) Whether a petitioner gets credit toward the ninety days for the time before, or between, a petition submission when the Attorney General and Secretary of State do not have a petition to review and consider under Ohio Rev. Code § 3519.01?

(ECF No. 39 at 19).

Defendants' arguments are well-taken. In describing their First Amendment claims, Plaintiffs refer to the burden as one on the 90-day period. Specifically, Plaintiffs claim: "[w]ith respect to the pre-approval requirements imposed on all referendum-petition efforts by the Summary Statute, "two distinct aspects run afoul of the First Amendment as they ***directly impact and unconstitutionally burden the 90-day period*** in which to circulate a referendum petition[.]" (ECF No. 32 at 10-11.) As Plaintiffs acknowledge, this 90-day period they claim is burdened arises from the Ohio, not the federal, Constitution. Whether the Ohio Constitution guarantees a full 90-day period for petition circulation, and whether the statute's requirements "burden the 90-day period" is a question beyond the jurisdiction of this Court.

Instead, these questions should be resolved by the Ohio Supreme Court. Several Ohio Supreme Court decisions have tangentially discussed, without deciding, the issues raised in this case. In 1972, the Ohio Supreme Court declined to address the constitutionality of "the overall concept of the Attorney General statutory power of the concept of preliminary examination concerning proposed constitutional amendments under R.C. Chapter 3519." *State ex rel. Tulley v. Brown*, 29 Ohio St.2d 235, 237 (Ohio 1972). Two justices dissented because they believed the statute to be unconstitutional. Justice Brown stated that even though no party raised the constitutionality of the statute, it struck him as "being unconstitutional on its face, since due process of law demands that the public be allowed to rely on the wording of a mere summary

21

thereof. Such restricts and circumvents, rather than facilitates, the people's important right to know what they are actually petitioning for." *Id.* at 240. And Justice Schneider said "requiring a 'preliminary' petition for the consideration of a summary of a proposed constitutional amendment by initiative for the purpose of including that summary on the initiative petition itself (see R.C. § 3519.05), conflicts with the plain terms of Section 1g, Article II of the Ohio Constitution, which requires the initiative petition to contain the title and text of the proposed amendment and sanctions no such summary of that text." *Id.* at 239.

In *State ex rel. Barren v. Brown*, 51 Ohio St.2d 169 (Ohio 1977), the Attorney General had refused to certify the referendum proponents' summary because he did not believe the matters were subject to referendum. *Id.* at 171. The Ohio Supreme Court allowed a writ of mandamus directing him to certify the summary, noting that his refusal to do so "impose[d] a great hardship upon electors wishing a referendum because of the relatively short 90-day period. Such action may have the effect of denying the electors of Ohio their constitutional right to referendum." *Id.*

Ohio courts of appeal have provided some guidance on Ohio Rev. Code § 3519.01(B), but to a mixed result. In *State ex rel. Alexander v. Brown*, 51 Ohio App.3d 26 (10th Dist. 1988), the Tenth District Court of Appeals considered a petitioner's challenge to the constitutionality of Ohio Rev. Code § 3519.01(B) claiming that "because the time required to perform the duties imposed on the Attorney General and Secretary of State by R.C. 3519.01 and 3519.05 takes away from the time allowed to obtain signatures on a referendum petition, the statutes infringe upon the right of referendum granted under Section 1c, Article II of the Ohio Constitution, and are therefore unconstitutional." *Id.* at 127. The Tenth District Court of Appeals did not decide the merits of his claim, instead finding that his delay in filing his suit foreclosed his challenge:

> In this instance, appellant knew as of the date the petitions were attempted to be
> filed, May 5, 1986, there were insufficient signatures but still waited over two

22

months before filing suit. Rather than filing an original action in mandamus in the Ohio Supreme Court or in this court to compel the granting of an additional twenty-nine days to gather signatures, and raising the constitutionality of R.C. 3519.01 and 3519.05, appellant filed in common pleas court, where the appeal process and final determination of the issue would extend well past the date of the election. By the time appellant filed suit, R.C. 4513.263 had already become law.

\*\*\*

As discussed above, appellant's delay in filing suit made it impossible for final determination of the issues raised to be made before the November 1986 election, the election at which the referendum should have been submitted to the voters.

*Id.* at 128-130. The closest case, cited by both parties, is *Schaller v. Rodgers*, 10th Dist. Franklin No. 08AP-591, 2008-Ohio-4464. There, the Tenth District Court of Appeals affirmed the trial court in finding petitioners were not likely to succeed on the merits of their challenge to Ohio Rev. Code § 3519.01(B). The appellants claimed that Ohio Rev. Code § 3519.01(B), and Ohio Rev. Code § 3519.05, were unconstitutional because the statutes limited and restricted the right of referendum and the freedom of speech, assembly, and petition rights under the Ohio Constitution. *Id.* at ¶ 5. Specifically, the appellants claimed that the statutes violated the right of referendum by allowing the Attorney General 10 business days to review and certify the summary as fair and truthful. The appellants cited *State ex rel. Durell v. Celebrezze* 63 Ohio App.2d 125 (10th Dist. 1979), where the court refused to enjoin the secretary of state from transmitting petition to the Ohio General Assembly because of a procedural error by the Attorney General in certifying a proposed summary without the required 1,000. *Schaller,* 2008-Ohio-4464 at ¶ 41. In *Durrell,* the court concluded:

Strictly speaking, the statutory procedure under R.C. 3519.01 is not part of the initiative process but is a statutory requirement prior to commencement of the initiative process under the Constitution. The statutory process is complete upon the certification by the Attorney General that the summary is accurate. It is at this point that the constitutional initiative process commences.

*Durrell*, 63 Ohio App.2d at 131.[8] The court in *Schaller*, however, concluded that *Durrell* had no impact on the matter before them, and held that "while the court expressed its opinion that the statutory initiative process was separate from the constitutional initiative process, it expressed no opinion about when the constitutional referendum process, which has a 90–day time frame that includes the time for certifications under R.C. 3519.01(B), begins." 2008-Ohio-4464 at ¶ 42.

The court considered the summary requirement in detail:

> We also consider whether the summary requirement contained within R.C. 3519.01(B)(1) facilitates the process. Requiring a summary of the law sought to be repealed arguably helps potential signers understand the content of the law more efficiently than if they had to rely solely on a review of the entire law, especially where the law sought to be repealed is lengthy, complicated or difficult to navigate. To be sure, Section 1g gives potential signers the right to rely upon the actual text of the law, as Justice Brown observed in his *Tulley* dissent, but R.C. 3519.01(B)(1) and 3519.05 protect that right by not only requiring the petition to include a summary, but also requiring it to include the full text of the law.

> Requiring a summary on the petition may also help deter circulation fraud and abuse by deterring circulators from misrepresenting the contents or impact of the law sought to be repealed. While the full text of the law is available to potential signers, the summary is an accessible check against misrepresentations and misstatements, especially where it is not practical for a signer to review the entire law.

> The heart of appellants' arguments is their objection to the requirement, contained within R.C. 3519.01(B)(3), that the summary must be submitted to the attorney general for review. If the requirement of a summary facilitates the referendum petition process, however, the requirement of attorney general review and certification of that summary arguably would also facilitate the process. A summary is valuable to a potential signer only if it is fair and truthful, just as a summary deters circulation fraud and abuse only if it is fair and truthful. While there may be any number of ways to ensure the integrity of the summary itself, requiring review by the attorney general, the top law officer for the state, may be a reasonable method for doing so.

---

[8] The Tenth District Court of Appeals in *Durrell* also declined to weigh-in on the constitutionality of the statute challenged here: "Like the Supreme Court, however, we feel it unnecessary to resolve the issue as to whether or not the requirements of R.C. 3519.01, including those requiring that a written petition be filed with the Attorney General, are constitutional, inasmuch as, even if such section is constitutional, the error of the Attorney General in failing to require strict compliance with the provisions of the statute does not at this stage vitiate the subsequent proceedings." *Id.* at 130.

*Id.* at ¶¶ 46-48. The appellants' main concern, as is Plaintiffs' here, was time. *Id.* at ¶ 49. Appellants argued that the time afforded to the Attorney General "deprive[d] them of valuable time within their limited, 90-day time frame. Those ten business days, they argue, can actually encompass up to 16 calendar days when the ten-business-day window includes two weekends and a legal holiday." *Id.* at ¶ 50. The *Schaller* court concluded that the Attorney General could not block a petition effort altogether because of the 10 day limit. *Id.* at ¶ 51. However, the court did acknowledge the "daunting task facing potential petitioners" before affirming the lower court's judgment:

> While the population of Ohio grows, so grows the number of signatures required to meet the 6 percent constitutional requirement. Appellants have argued that the ten-business-day review could cripple a petitioner's efforts at gathering the necessary signatures to meet the 90-day deadline. Arguably, however, the ten-business-day provision would not always cripple such efforts. The fact that the ten-business-day provision might work to restrict, rather than facilitate, the referendum process under some plausible set of circumstances is insufficient to render the trial court's denial of relief an abuse of discretion.

*Id.* at ¶ 52. In *State ex rel. Ethics First-You Decide Ohio Political Action Commt. v. DeWine*, 147 Ohio St.3d 373 (Ohio 2016), the Ohio Supreme Court considered a challenge to the initiative procedure. The court specifically addressed the requirement that the Ohio Ballot Board review an initiative proposal and subdivide it if it contains more than one amendment. The relators claim that in Ohio Revised Code § 3519.01(A) and 3505.062(A) unconstitutionally limited the right of initiative and violated the First Amendment to the federal Constitution. *Id.* at 375. The Ohio Supreme Court adopted the reasoning of the *Schaller* opinion implying that the "modest burden" on the petitioners imposed by the summary requirement was outweighed by the benefit to the voters and process in general. *Id.* at 377. The Supreme Court concluded that when the Ballot Board divides a petition, "R.C. 3505.062(A) merely requires the submission of new summaries to the attorney general. That modest imposition does not unduly restrict the right of initiative, given

the benefit the voters enjoy of being able to vote separately on the proposals." *Id*. The court concluded that the provision was not content-based because it applied "to all petitions, irrespective of the substantive message the petition seeks to communicate." *Id*. at 378. While the Supreme Court did "adopt the reasoning of *Schaller*," it was considering the constitutionality of Ohio Rev. Code § 3519.01(A), not the challenged statute here of Ohio Rev. Code § 3519.01(B).

Defendant LaRose claims that "Plaintiffs' federal constitutional claim depends entirely on their personal interpretation of Ohio law. But it is not a foregone conclusion that the Ohio Supreme Court would interpret Ohio's fair-and-truthful laws in the same manner as Plaintiffs. If it does not, Plaintiffs' federal question may be avoided all together." (ECF No. 39 at 19.)

Defendant LaRose's arguments are well-taken. At the heart of Plaintiffs' claims is proposition that the Ohio Constitution affords them 90 days to circulate a referendum petition, and that their First Amendment rights are violated by the statute because of the blackout period. But Ohio courts have not held whether the 90-day period is guaranteed for circulating or whether the required review by the Attorney General violates the Ohio Constitution.

Moreover, the Ohio Supreme Court could afford Plaintiffs the remedy they seek—a stay of H.B. 6 and additional time to circulate their petitions. In *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St. 3d 322, 336 (Ohio 2009), the Ohio Supreme Court ensured the relators had 90 days for their referendum effort. After determining it had jurisdiction, that mandamus was an appropriate remedy, and that the provisions were subject to referendum, the Ohio Supreme Court ordered:

> In conformity with our decision in *Ohio AFL–CIO*, 69 Ohio St.3d at 236–237, 631 N.E.2d 582, and as acknowledged by the respondents at oral argument, relators are entitled to an extension of the 90–day period in which to submit a referendum petition on the VLT provisions to the secretary of state. We therefore stay the amendments to R.C. 3770.03 and the enactment of R.C. 3770.21, which are the

VLT provisions of H.B. 1, for 90 days from the date of this decision in order to allow relators a meaningful opportunity to circulate a referendum petition.

*Id.* at 336; *see also State ex rel. Ohio Gen. Assembly v. Brunner*, 115 Ohio St. 3d 103, 106, (Ohio 2007) (granting 90 days to citizens of Ohio to file a referendum petition against bill to begin on date of opinion holding law was valid after veto-attempt); *State ex rel. Ohio AFL-CIO v. Voinovich*, 1994-Ohio-1, 69 Ohio St. 3d 225, 236–37, 631 N.E.2d 582, 591, *opinion clarified*, 69 Ohio St. 3d 1208, 632 N.E.2d 907 (1994) ("We therefore stay the nonappropriation provisions of Am.Sub.H.B. No. 107 for a period of ninety days from the date of this decision. During this ninety-day period, relators may undertake to submit to the Secretary of State a petition for a referendum on the provisions of Am.Sub.H.B. No. 107 that change the permanent law of the state.").

This Court concludes that certification of significant state law issues to the Ohio Supreme Court is prudent. The purpose of certification "is to apply the same rules of state law to litigants in federal court as would apply in state court." *Whittaker v. Allstate Prop. & Cas. Ins. Co.*, No. 2:15-CV-02584, 2017 WL 2491624, at *1–2 (S.D. Ohio June 9, 2017) (quoting *Scott v. Bank One Trust Co., N.A.*, 62 Ohio St.3d 39, 46 (1991)). "Through certifying questions to the state Supreme Court, a district court 'faced with a novel state-law question [may] put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of an authoritative response.'" *Id.* (quoting *Jones v. Coleman*, 848 F.3d 744, 750 (6th Cir. 2017)).

"As the Supreme Court of Ohio has explained, '[c]ertification ensures that federal courts will properly apply state law.'" *Am. Booksellers Found. for Free Expression v. Strickland*, 560 F.3d 443, 446–47 (6th Cir. 2009*), certified question answered sub nom. Am. Booksellers Found. for Free Expression v. Cordray*, 2010-Ohio-149, 124 Ohio St. 3d 329, 922 N.E.2d 192 (quoting *Scott v. Bank One Trust Co., N.A.*, 62 Ohio St.3d 39, 577 N.E.2d 1077, 1081 (1991) (per curiam)). "The United States Supreme Court also recognizes that 'certification of novel or

unsettled questions of state law for authoritative answers by a State's highest court...may save time, energy, and resources and help build a cooperative judicial federalism.'" *Id.* (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 77 (1997) (internal quotations and alterations omitted)).

"Federal courts certify questions if an 'unconstrued state statute is susceptible of a construction by the state judiciary which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially chance the nature of the problem.'" *Id.* (quoting *Bellotti v. Baird,* 428 U.S. 132, 147 (1976)). "Absent an authoritative interpretation by the state court, 'it is impossible to define precisely the constitutional question presented.'" *Id* (quoting *Baird* at 148).

As set forth above, the Court finds that there are questions of Ohio law determinative of these proceedings, and that there is no controlling precedent by the Ohio Supreme Court. *See* S.Ct.Prac.R. 9.01. Accordingly, the Court certifies the following questions to the Ohio Supreme Court pursuant to Supreme Court Rule of Practice 9.01:

1.) Whether the right to referendum set forth in Article II, Section 1 of the Ohio Constitution guarantees those circulating petitions in support of a referendum a full ninety days solely for the purpose of circulating petitions?

2.) If so, whether Ohio Rev. Code § 3519.01 violates the Ohio Constitution by shortening the ninety days to accommodate the fair-and-truthful review?

3.) If the Ohio Constitution guarantees a petitioner ninety days to circulate petitions, whether the number of days attributable to a petitioner's own errors in submitting a referendum petition under Ohio Rev. Code § 3519.01 is "credited" to the petitioner, or deducted from the ninety days?

4.) Whether a petitioner who does not claim to be "aggrieved" by the fair-and-truthful determination and thus fails to appeal the denial of a certification under Ohio Rev. Code § 3519.01(C) is entitled to credit toward the ninety days for the time spent fixing deficiencies in a fair-and-truthful statement?

5.) Whether a petitioner gets credit toward the ninety days for the time before, or between, a petition submission when the Attorney General and Secretary of State do not have a petition to review and consider under Ohio Rev. Code § 3519.01?

A separate Order containing the information required by Supreme Court Rule of Practice 9.02 will follow.

## V. CONCLUSION

Based upon the foregoing, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction and **CERTIFIES** the above questions to the Supreme Court of Ohio.

**IT IS SO ORDERED.**

_10-23-2019_
**DATE**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**